**CONSOLIDATED INTERNATIONAL AUTOMOTIVE, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 91–09–00701.**

United States Court of International Trade.

Dec. 15, 1992.

Hume & Associates, Robert T. Hume, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Marc E. Montalbine, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Robert E. Nielsen, for defendant.

## OPINION

RESTANI, Judge:

Plaintiff, Consolidated International Automotive, Inc. ("Consolidated"), challenges the determination of the United States Department of Commerce, International Trade Administration ("Commerce" or "ITA") in *Chrome–Plated Lug Nuts from Taiwan*, 56 Fed.Reg. 36,130 (Dep't Comm. 1991) (final determ. of sales at less than fair value) (*"Final Determination"*). The investigation covered chrome-plated lug nuts, finished or unfinished, from Taiwan, and the period May 1, 1990 through October 31, 1990. ITA determined that chrome-plated lug nuts from Taiwan are being, or are likely to be, sold in the United States at less than fair value. *Final Determination*, at 36,130.

The case is before the court on Consolidated's motion for judgment upon the agency record. ITA's determination is sustained.

## BACKGROUND

On November 1, 1990, Consolidated filed an antidumping petition regarding chrome-plated lug nuts, finished or unfinished, from Taiwan. The respondents were Gourmet Equipment (Taiwan) Corporation ("Gourmet") and San Shing Hardware Works Co., Ltd. ("San Shing").

Most of the issues raised by Consolidated in this action relate to Gourmet. ITA determined that although Gourmet subcontracts certain processes and purchases major inputs, it organizes production, performs certain processing, and produces caps. Based on this, ITA found Gourmet to be the manufacturer of the chrome-plated lug nuts at issue. Gourmet sells these chrome-plated lug nuts to unrelated trading companies for export to the United States. Because the U.S. customer is identified on the purchase order or on the shipping mark requested by the trading companies, Gourmet knows which sales are intended for export to the United States.

Gourmet produces various types of chrome-plated lug nuts. For lug nut type 9A, Gourmet converts lug nut blanks provided by a U.S. customer into chrome-plated lug nuts, and ships directly to the U.S. customer. This is known as a tolling operation. ITA found that Gourmet was the producer of lug nut type 9A.

Where home market sales were absent or insufficient, ITA used constructed value to determine foreign market value. *See* 19 U.S.C. § 1677b(a)(2) (1988). With respect to Gourmet, constructed value was used for some types of lug nuts, including type 9A; constructed value was also used for San Shing's product.

The one issue involving San Shing is whether ITA erred by deducting an export rebate in calculating cost-based constructed value. The court will discuss this issue first, and then turn to the issues involving Gourmet.

## SCOPE OF REVIEW

■ ITA's decision will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).[1]

## DISCUSSION

### 1. Rebate

■ Consolidated argues that ITA erred in deducting from material costs the value of a rebate applicable to the purchase of steel wire by San Shing upon export of the manufactured product. According to Consolidated, the rebate was a countervailable subsidy. It is well settled that Commerce is not to undertake countervailing duty investigations in the context of antidumping proceedings, and that plaintiff's remedy is to file a separate countervailing duty petition. See Al Tech Specialty Steel Corp. v. United States, 10 CIT 743, 752–53, 651 F.Supp. 1421, 1429–30 (1986); Huffy Corp. v. United States, 10 CIT 214, 220, 632 F.Supp. 50, 55–56 (1986); see also United States v. European Trading Co., 27 CCPA 289, 297, C.A.D. 103 (1940); Far East Mach. Co., Ltd. v. United States, 12 CIT 972, 977–78, 699 F.Supp. 309, 314 (1988); Sawhill Tubular Div. Cyclops Corp. v. United States, 11 CIT 491, 499–500, 666 F.Supp. 1550, 1556–57 (1987).

Consolidated asks the court to reconsider these precedents based on an unconvincing reinterpretation of the legislative history of 19 U.S.C. § 1677d.[2] Consolidated argues that this section indicates that subsidies should be investigated in both antidumping

and countervailing duty proceedings. This is a strained reading of the statute. The court adheres to precedent.

### 2. Use of transfer prices for inputs and other objections to foreign market value

■ Consolidated objects to ITA's use of transfer prices for inputs in determining constructed value for Gourmet, even though the prices were charged by an unrelated party. Because constructed value is based on cost, Consolidated argues ITA should examine the cost of production of the input. See 19 U.S.C. § 1677b(e). If Gourmet is the producer, its costs are relevant. Prices it pays for materials are part of its costs. Thus, what it pays for inputs must be used to calculate constructed value, unless the sale of the input is by a related party, which is not the case here.[3] The question is whether Gourmet is the producer of the product. As indicated, ITA considered Gourmet to be the producer because it organized production and performed certain processes. A "producer" is defined in 19 C.F.R. § 353.2(r) as a "manufacturer or producer." The record reveals that Gourmet is sufficiently involved in manufacturing, so that ITA's conclusion that it is a manufacturer or producer is supported. ITA's determination to use transfer prices in this situation is also consistent with its past practice for both tolled and non-tolled sales. See Color Television Receivers, Except for Video Monitors, from Taiwan, 55 Fed.Reg. 47,093, 47,100 (Dep't Comm.1990) (final results of antidumping duty admin. review).[4]

1. Citations to the United States Code are to the 1988 edition, and citations to the Code of Federal Regulations are to the 1992 edition.

2. 19 U.S.C. § 1677d reads as follows:
   **§ 1677d. Subsidy practices discovered during a proceeding**
   If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which appears to be a subsidy, but was not included in the matters alleged in a countervailing duty petition, then the administering authority—
   (1) shall include the practice in the proceeding if it appears to be a subsidy with respect to the merchandise which is the subject of the proceeding, or

(2) shall transfer the information concerning the practice (other than confidential information) to the library maintained under section 1677f(a)(1) of this title, if the practice appears to be a subsidy with respect to any other merchandise.
19 U.S.C. § 1677d (emphasis added).

3. 19 U.S.C. §§ 1677b(e)(2) and 1677b(e)(3) are specifically designed to handle related party transactions. Obviously, in the absence of related parties, transaction prices are usable.

4. Consolidated has not explained how it makes economic sense to concentrate on unrelated parties in the chain of sale of inputs and why the statute would be aimed at such product

■ The fact that some sales are tolled sales is not determinative.[5] As ITA's decision that Gourmet is a producer is supported,[6] ITA need only perform a proper comparison of the constructed value of the tolling service to the charge to the U.S. customer. The court perceives no error in ITA's methodology in this regard.

■ Consolidated also objects to the foreign market value in that Commerce did not verify all of Gourmet's data. It also objects to ITA's acceptance of some of the verified costs and ITA's choices where data could not be verified. ITA verified the most significant foreign market value data. Where, in a few instances, it could not verify all costs because of accounting record difficulties, ITA used best information available ("BIA"), as authorized by 19 U.S.C. § 1677e(c). The court finds no error in ITA's method of verification or in the choices it made in determining costs or in selecting "BIA." The choices are adequately explained in ITA's determination.

### 3. Ocean freight

■ Consolidated objects to Commerce's allocation of freight costs according to volume. Consolidated prefers a weight-based allocation. Gourmet presented its data based on a volume allocation, which Commerce verified. Consolidated's position is that the allocation may be skewed because

"heavy" lug nuts may have been shipped with lighter items. There is no basis for Consolidated's conjecture that metal lug nuts may have been mixed with some lightweight and high-volume items for shipping. Gourmet makes metal objects, and the volume allocation method seems as accurate as any suggested by Consolidated.

### 4. Exchange rates

■ ITA asserts that it made currency conversions for constructed value figures as of the date of U.S. sale, in accordance with its standard practice and applicable regulations.[7] ITA determined the date of U.S. sale to be the invoice date.

Consolidated argues that currency conversions should be based on rates in existence up to forty-five days earlier because in its invoice Gourmet states that it will ship within forty-five days of the order. Thus, Consolidated argues, costs are incurred within the forty-five days preceding shipment. First, there is no evidence of when during the forty-five day period costs for particular shipments are actually incurred. Second, the regulation does not mandate that costs be determined exactly as of the date incurred. Third, the regulations do not permit conversion to be made as of a date later than the date of sale, and date of sale may or may not be the date of shipment or exportation.[8] ITA's decision

---

costs. It would seem that unrelated parties remote to the export transaction could not profit by selling inputs at artificially low prices.

5. Consolidated appears to make an alternative claim that the seller of the lug blanks for the tolling operation should have been a separate respondent. First, this was not requested. Second, lug blanks are not within the scope of the investigation, which covers finished and unfinished chrome-plated lug nuts.

6. Consolidated claims Gourmet's production activities were insignificant, but according to Consolidated they account for approximately twenty percent of value of non-tolled sales. Consolidated has not demonstrated that either tolled or non-tolled sales production activities were "insignificant."

7. 19 C.F.R. § 353.60(a) reads:
 § 353.60  Conversion of currency.
  (a) *Rule for conversion.* The Secretary will convert, under section 522 of the Act (31

U.S.C. 5151(c)), a foreign currency into the equivalent amount of United States currency at the rates in effect on the dates described in § 353.46, § 353.49, or § 353.50, as appropriate.
 19 C.F.R. § 353.60(a).

8. 19 C.F.R. § 353.50(b) reads:
  (b) *Time for calculating constructed value.*
  (1) When United States price is based on purchase price, under § 353.41(b), the Secretary will calculate constructed value, ... based on the relevant costs and expenses at a time preceding the time the producer or a reseller sells the merchandise for exportation to the United States.
  (2) When United States price is based on exporter's sales price, under § 353.41(c), the Secretary will calculate constructed value, ... based on the relevant costs and expenses at a time preceding the time the importer sells the merchandise in the United States to a person not related under section 773(e)(4) of the Act.
 19 C.F.R. § 353.50(b).

to use exchange rates as of the date of sale is a reasonable economic and administrative choice. Furthermore, there is no evidence supporting a date for conversion, other than that selected by ITA.

### 5. *Interest rates*

ITA made an adjustment to credit expenses for different circumstances of sale. ITA used the Central Bank of China weight-averaged short-term interest rate to determine the credit expense for Gourmet's sales to its direct U.S. customers. The credit expense accounts for the lag between the date of shipment and date of payment. As Gourmet does not claim a credit expense on its books, ITA had to resort to the best information available. Consolidated does not support its objection to ITA's choice other than by conjecture, and Consolidated's choice of San Shing's rate is not mandated.

### 6. *Middleman dumping*

Consolidated also claims that ITA failed to investigate dumping by the trading companies involved in the exportations at issue. ITA "require[s] timely and convincing evidence that the trading company is in fact dumping before initiating an investigation with respect to the trading company." *Certain Forged Steel Crankshafts from Japan*, 52 Fed.Reg. 36,984, 36,985 (final determ. of sales at not than less than fair value) (Dep't Comm.1987). While Consolidated did offer a theory about trading company dumping, it offered no data sufficient to compel ITA to undertake an investigation. ITA's determination that Consolidated did not make a claim that Gourmet's trading company was engaged in middleman dumping is sustained.

ITA's determination is sustained.

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: That the determination of the International Trade Administration is sustained.