**SHIELDALLOY METALLURGICAL CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Galt Alloys, Inc., Defendant–Intervenor Plaintiff.**

Slip Op. 96–186.
Court No. 95–08–01034.

United States Court of International Trade.

Nov. 19, 1996.

Cheryl Ellsworth, Herbert E. Harris II, Jeffrey S. Levin, Jennifer de Laurentiis (Harris & Ellsworth), Washington, DC, for plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Lydia K. Griggsby, Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; David W. Richardson, General Attorney, International Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, Washington, DC, for defendant.

Jeffrey S. Neeley (Ross & Hardies), Washington, DC, for defendant-intervenor, plaintiff.

## OPINION

POGUE, Judge:

Plaintiffs, Shieldalloy Metallurgical Corporation (Shieldalloy) and Galt Alloys, Inc. filed separate actions challenging aspects of the International Trade Administration's final determination in Ferrovanadium and Nitrided Vanadium from the Russian Federation, 60 Fed.Reg. 27957 (Dep't Commerce 1995) (Final Det.) [hereinafter Final Determination]. The two actions were consolidated by the Court on October 31, 1995. Galt, as defendant-intervenor, also opposes Shieldalloy's motion for summary judgment.

The Court has jurisdiction under 28 U.S.C. § 1581(c) (1994) and 19 U.S.C. § 1516a(a)(2)(A) (1994).

## BACKGROUND

On May 31, 1994, Shieldalloy, a U.S. producer of ferrovanadium, filed a petition with the Department of Commerce (Commerce) and the United States International Trade Commission (ITC) alleging that imports of ferrovanadium and nitrided vanadium from Russia were being sold in the U.S. at less than fair value, and that an industry in the U.S. was materially injured, or threatened with material injury, by reason of these imports.

Vanadium is a grayish-white metallic element found in ores in the United States and Mexico, as well as in South America, Africa, and Russia. Vanadium is chiefly used in steel alloys to increase elasticity and tensile strength. J.G. Henderson, *Metallurgical Dictionary* 346, (Reinhold Publishing Corp. 1953).

Based on Shieldalloy's petition, Commerce initiated an antidumping duty investigation on June 20, 1994.[1] Commerce identified five parties as respondents to the investigation: Tulachermet, a Russian producer/exporter; Chusavoy, a Russian producer/exporter; Odermet, a United Kingdom exporter of Tulachermet ferrovanadium [2]; Galt Alloys, Inc. (Galt), a U.S. importer of the subject merchandise, treated as an exporter-respondent for purposes of this investigation; and Gesellschaft fur Electrometallurgie mbh (GfE), a German producer of ferrovanadium and nitrided vanadium [3] affiliated with Shieldalloy.[4]

In an antidumping duty investigation, Commerce compares foreign market value and United States price [5] to determine whether dumping exists, and the amount of the antidumping duty.

Some of the vanadium Shieldalloy sells in the United States comes from its affiliate, GfE, which obtains the vanadium from Russia. For purposes of the investigation of GfE, Commerce was required to use information on Shieldalloy's sales to unaffiliated purchasers to calculate GfE's United States price [6]. Shieldalloy was thus required to provide sales data to Commerce, putting Shieldalloy in the unusual position of being both a petitioner and a respondent in this case.

On May 26, 1995, Commerce issued its final determination of sales at less than fair value. The final dumping margins set by Commerce were as follows: a Russia-wide margin of 108 percent *ad valorem* for all manufacturers/producers/exporters other

than Odermet, Galt and GfE; a margin of 10.10 percent *ad valorem* with respect to exports by Odermet; a margin of 3.75 percent *ad valorem* with respect to exports by Galt; and a margin of 11.72 percent *ad valorem* with respect to exports by GfE. 60 Fed.Reg. 27957.

On June 30, 1995, the International Trade Commission informed Commerce that it had issued a final affirmative determination that imports of Russian ferrovanadium and nitrided vanadium were injuring the U.S. domestic industry and on July 10, 1995, Commerce issued an antidumping duty order on ferrovanadium and nitrided vanadium from the Russian Federation.

Plaintiff, Shieldalloy, commenced this action in the United States Court of International Trade on August 8, 1995, appealing certain aspects of the May 26, 1995 Final Determination. Subsequently, Galt filed a summons and complaint with this Court contesting certain aspects of the department's final affirmative determination.

For purposes of this investigation, Commerce treated Russia as a non-market economy (NME) country. Therefore, pursuant to 19 U.S.C. § 1677b(c) (1988), Commerce determined the foreign market value of the merchandise at issue based on the value of the factors of production utilized in producing the merchandise. Commerce calculated the value of the various factors of production based upon their prices or costs in market economy countries. The statute requires that, to the extent possible, the surrogate prices come from countries that are "(A) at a level of economic development comparable to

1. Ferrovanadium and Nitrided Vanadium from the Russian Federation, 59 Fed.Reg. 32952 (Dep't Comm. June 27, 1994) (Notice Init. Antidumping Duty Invest.).

2. Because vanadium is difficult to isolate, it is often produced in the form of ferrovanadium. *Metallurgical Dictionary* at 346.

3. "Nitrided vanadium includes compounds containing vanadium as the predominant element, by weight, and at least 5 percent, by weight, of nitrogen." Final Determination at 27957.

4. Defendant's Memo. in Opp. to Pl.'s Motions for J. upon the Agency Rec. 6.

5. 19 U.S.C. §§ 1677a, 1677b (1988). The terminology has since changed. Under the current statute, "normal value" has replaced the term "foreign market value," and "export price and constructed export price" have replaced the term "United States price." *See* 19 U.S.C. §§ 1677a, 1677b (1994).

6. If an exporter and importer are related, Commerce calculates the exporter's United States price based on the "exporter's sales price." Exporter's sales price is the price at which the goods are eventually transferred "in an arm's length transaction," from the importer to either a retailer or the public. *Smith–Corona Group v. United States*, 713 F.2d 1568, 1572 (1983).

that of the non-market economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4) (1988).

Shieldalloy objected to the following aspects of Commerce's determination:

1) The use of Tulachermet's factors of production information instead of Best Information Available (BIA) to calculate foreign market value for Odermet;

2) Commerce's method for adjusting the price of South African vanadium slag (Vanadium slag is one of the raw materials used in the production of ferrovanadium and nitrided vanadium.);

3) Commerce's failure to adjust the calculated foreign market value for the subject merchandise to reflect the Russian producers' freight costs;

4) Commerce's method for converting foreign currencies to United States dollars;

5) Commerce's failure to inflate surrogate values from 1993 to period-of-investigation levels;

6) Commerce's use of Galt, rather than Galt/Hascor or Hascor alone as a respondent.

Galt objected to two aspects of Commerce's final determination:

1) Commerce's use of the GfE/Shieldalloy sales response rather than adverse BIA;

2) Commerce's reliance on the factory overhead figures submitted by GfE to calculate factory overhead for Russian producers.

## STANDARD OF REVIEW

In reviewing a final antidumping determination, the Court of International Trade must determine whether Commerce's determination is in accordance with law, and whether Commerce's conclusion is supported by substantial evidence on the record. Section 516a(b)(1)(B)(i) of the Tariff Act of 1930, 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoted in *Matsushita Elec. Indus. Co., Ltd. v. U.S.*, 3 Fed.Cir. (T) 44, 51, 750 F.2d 927, 933 (1984)).

The record consists of "(i) a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case ...; and (ii) a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register." 19 U.S.C. § 1516a(b)(2)(A) (1994).

As a general rule, an administrative agency must articulate the reasons supporting its decision, enabling the court to review whether the agency acted arbitrarily. *Nachi–Fujikoshi Corp. v. U.S.*, 16 CIT 606, 609, 798 F.Supp. 716, 719 (1992) (citing *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974)). "[I]n order to reach a judgment on the administrative record, the Court must have a basis for understanding the reasons for Commerce's actions." *Timken Co. v. United States*, 937 F.Supp. 953, 955 (CIT, 1996) (citing *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). "[W]here an explanation is lacking on the record, post hoc rationalization for Commerce's actions is insufficient." *Id.*

When Commerce's interpretation of the antidumping statute is challenged, this court applies the two-step analysis found in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*,[7] as applied and refined by the Federal Circuit. Under *Chevron*, when a court reviews an agency's construction of the statute which it administers it must first determine whether Congress has directly spoken to the precise question at issue. If Congress has left a gap in the statute, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." 467 U.S. at 844, 104 S.Ct. at 2782.

---

7. 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

## DISCUSSION

### Issues Raised by Shieldalloy

#### 1. Use of Tulachermet's Factors of Production Values

■ Shieldalloy objects to Commerce's use of the factors-of-production values submitted by Tulachermet to calculate foreign market value for Odermet, a British exporter of Tulachermet ferrovanadium and nitrided vanadium.

In verifying Tulachermet's United States sales data, Commerce found significant discrepancies between the information reported by Tulachermet and the data in Tulachermet's sales records. Commerce also had difficulty in gaining access to some documents. This difficulty compromised part of the verification process. Thus, Commerce designated Tulachermet an "unresponsive respondent." Final Determination, 60 Fed.Reg. 27957, 27960.

Pursuant to 19 U.S.C. § 1677e[8] Commerce applied BIA to all aspects of the Tulachermet investigation. When reviewing the responses of uncooperative respondents, Commerce explained, "Commerce's longstanding practice has been to disregard even the verified portions of a response if significant portions of the response cannot be verified." (Memo. in Opp. to Pl.'s Motion for J. Upon the Agency Rec. at 61). Plaintiff argues that, "[b]y the

same logic the Department was required to reject the Tulachermet information in calculating dumping margins for other respondents, specifically Odermet." (Memo. in Supp. of Pl.'s Motion for J. upon the Agency Rec. at 25).

In support of its argument, Plaintiff offers several examples of instances in which Commerce applied BIA to cooperative parties.[9] Plaintiff also cites 19 U.S.C. § 1677e(c)[10], and the Department's own regulations. The regulations require the use of BIA whenever the Secretary "(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted."[11] Although the statute clearly mandates the use of BIA against uncooperative respondents, nothing in the statute, the regulations or the case law requires the use of BIA against a *cooperative* respondent when verified data is available on the record. The inquiry does not end there, however. Even if Commerce's determination is in accordance with law, it must also be supported by substantial evidence on the record. In its memorandum to this Court, Commerce says that it did not apply BIA to Odermet because Odermet fully cooperated with Commerce during the investigation and because "Commerce was able to

---

**8.** "[Commerce] shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, ..., use the best information available." 19 U.S.C. § 1677e(c). The statute also provides that "If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action, which may include ... the information submitted in support of the petition." 19 U.S.C. § 1677e(b)

**9.** *See Reply Brief of Shieldalloy Metallurgical Corp.* at 25–28. In particular, plaintiff cites *Yue Pak, Ltd v. United States*, slip op. 96–65, 1996 WL 193712 (April 18, 1996), a case involving chemicals manufactured in the People's Republic of China. In that case, Commerce applied the same BIA rate to all producers of the subject merchandise after determining that the producers had not demonstrated enough independence from the state-controlled economy to justify the application of separate rates. Commerce also applied the same rate to Hong Kong exporters,

after deciding that the exporters did not meet the criteria for intermediate country exporters. Two of the Hong Kong resellers challenged the decision on the grounds that they were cooperative in their responses, so Commerce's use of BIA was not supported by substantial evidence or otherwise in accordance with law.

The Court dismissed the complaint stating, "Commerce is afforded considerable deference in determining what constitutes best information.... [W]hen resellers choose to use uncooperative suppliers that are under a dumping order, it is irrelevant that such resellers are cooperative in their questionnaire responses." (relying on *Peer Bearing Co. v. United States*, 16 CIT 799, 800 F.Supp. 959 (1992)).

**10.** "[T]he administering authority ... shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, ... use the best information otherwise available."

**11.** 19 C.F.R. § 353.37(a).

verify significant portions of Tulachermet's factors of production questionnaire response." (Def.'s Memo. in Opp. to Pl.'s Motion for J. Upon the Agency Rec. at 61–62).

This argument is, in part, a *post hoc* rationalization. The verification of Tulachermet's factors of production values is supported by substantial evidence, specifically, the Tulachermet Verification Report (Def.'s ex. 3). However, Commerce never explicitly stated in the Final Determination that Odermet was cooperative, or that it was applying Tulachermet's factors of production data to Odermet because of Odermet's cooperation. "An agency may not, ... shift the grounds it relied upon for taking action.... The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Olympic Adhesives, Inc. v. U.S.*, 8 Fed.Cir. (T) 69, 77, 899 F.2d 1565, 1572 (1990). Therefore, this issue must be remanded to give Commerce an opportunity to state its reasons for applying Tulachermet's factors of production to Odermet and to set out the evidence supporting its determination.

## 2. Valuation of Vanadium Slag

■ In calculating the Russian producers' foreign market value, Commerce used publicly available information on the value of South African vanadium slag from Highveld as a surrogate for the value of the Russian producers' slag. Highveld slag contains approximately 24 percent vanadium pentoxide.[12] Tulachermet and Chusavoy use lower-grade slags containing anywhere from 12–20% vanadium pentoxide. Final Determination at 27961.

In its preliminary determination, Commerce used a straight-line proportionate methodology to adjust the Highveld slag price to reflect more accurately the value of the Russian slags. In other words, Commerce took the known value of the Highveld slag and reduced it by the ratio between that slag's vanadium pentoxide content and the vanadium pentoxide content of the Russian material (Memo. in Supp. of Pl.'s Motion for J. Upon the Agency Rec. at 50). Shieldalloy

argues that the straight-line methodology was the correct one, and should have been used to set the final dumping margins.

Instead, Commerce abandoned the straight-line methodology and calculated the value of the lower grade slags based on the prices of different grades of vanadium pentoxide. Commerce determined that 98% vanadium pentoxide is produced from 24% slag, 90–92% vanadium pentoxide is produced from 16–20% slag, such as that used by Tulachermet, and 72% vanadium pentoxide is produced from 12–16% slag, such as that used by Chusavoy. Thus, Commerce concluded,

> The quality or grade of vanadium pentoxide is related to the purity (i.e. vanadium pentoxide) of the slag used for its production. Of course, the higher grade slags can be used to produce the lower grade vanadium pentoxide products, but the price premium for higher grade vanadium pentoxide per the *Metal Bulletin* prices does not encourage such substitution.

(Final Valuation Memorandum at 2).

Galt supports the Department's valuation methodology. Galt argues that the *Metal Bulletin* prices establish that, on average, the price of the 90% vanadium pentoxide was only 72.9% of the price for the Highveld product. "One would expect the price to be 91.8% of the Highveld price (90/98) if prices declined in a straight line based on pentoxide purity." (Def.–Int.'s Opp. to Pl.'s Motion for J. Upon the Agency Rec. at 7). According to Galt's expert witness, the reason for the disproportionate drop in value between higher and lower grades of vanadium pentoxide, and, by extension, vanadium slag, is that the greater levels of impurities make it more difficult and expensive to work with the lower grade materials. Galt argues, "[a] strictly straight-line approach to price declines would have accounted only for the decrease in the active ingredient, and not for the adverse effects of the increases in the other ingredients". *Id.* at 8.

12. Vanadium pentoxide, also known as $V_2O_5$, is an intermediate product in the production of ferrovanadium.

In the Final Valuation Memo, Commerce explained, "[w]ith the relationship between the slag and vanadium pentoxide production established, and the price differential between vanadium pentoxide produced from different grade slag demonstrated, we ... applied the price differential to the surrogate value in order to adjust the value of Highveld slag to Nizhni–Novgorod slag (the slag used by Tulachermet)." (Final Valuation Memo. at 3). The Final Valuation Memorandum is incorporated by reference into Commerce's Final Determination. *See* Final Determination at 27962.

Under the statute, Commerce is to value the factors of production "based on the best available information regarding the values of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1). The statute does not specify what constitutes best available information, nor does it prescribe a specific method for adjusting raw material prices to account for differences in grade or quality. Therefore, these decisions are within Commerce's discretion.

■ Commerce does not need to prove that its methodology was the only way, or even the best way to calculate surrogate values for vanadium slag. When an agency's method is challenged, "the proper role of this court, .... is 'to determine whether the methodology used by the [agency] is in accordance with law,' and as 'long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views

as to the sufficiency of the agency's investigation or question the agency's methodology.'" *GMN Georg Muller Nurnberg AG v. United States,* 15 CIT 174, 178, 763 F.Supp. 607, 611 (1991) (citing *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 965–66 (1986) (citations omitted)). The final valuation memo, together with the *Metal Bulletin* excerpts and testimony of Galt's expert witness provide substantial evidence that Commerce's approach was reasonable.[13]

However, the Court is remanding this issue to give Commerce the opportunity to correct the misleading language that appears in the Final Determination: "[T]he Highveld prices cited by Chusavoy, Galt, Odermet, and Tulachermet reflect the typical product, while the prices for the other 98% products reflect Chinese origin, and the 90% products are of Russian slag." In fact, as Commerce explains in its Memorandum to this Court, and as the record bears out, the prices for 90% products are not specifically for Russian slag; they "correspond to the levels reported for the Russia products." (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at 43 (quoting Final Valuation Memo. at 3)). This distinction is significant because the statute specifies that in cases where the merchandise under investigation is exported from a NME, foreign market value is to be determined based on "the best available information regarding the values of such factors *in a market economy country or countries*...." 19 U.S.C. § 1677b(c)(1) (emphasis added).

Finally, plaintiff argues that the vanadium pentoxide prices should have been adjusted to account for freight and insurance of the vanadium pentoxide from its point of origin to Europe (Memo. in Supp. of Pl.'s Motion for J. Upon the Agency Rec. at 67–68) However, there was no evidence upon the record to support such an adjustment. Therefore any adjustment that Commerce could have made would have been arbitrary (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at 47–48). The decision not to make such adjustments was within Commerce's discretion and reasonable based on the record.

---

13. Plaintiff also objects to Commerce's use of vanadium pentoxide values from before the POI (Memo. in Supp. of Pl.'s Motion for J. Upon the Agency Rec. at 65). However, as Commerce points out, Commerce did not use the actual prices in the pre-POI Metal Bulletin, but the ratio of the prices of 98% and 90% vanadium pentoxide. Furthermore, plaintiff acknowledges that no prices for Highveld 98% vanadium pentoxide were published during the POI. *Id.* at 66. Because Commerce was only using a ratio, and not actual prices, and there were no POI figures available, the Court finds that Commerce's use of the pre-POI data was a reasonable interpretation of the statutory requirement that Commerce use the best available information. *See* 19 U.S.C. § 1677b(c)(1) (1988).

### 3. Adjustment of Tulachermet's FMV to Account for Higher Shipping Costs

 Plaintiff also objects to Commerce's decision not to adjust the surrogate price of vanadium slag to account for the Russian companies' transportation costs. The return address on the Highveld price quote was Witbank, South Africa and the terms of sale include the provision, FOB Richards Bay (Def.'s Ex. 1). Richards Bay is 400 km from Witbank. Tulachermet obtains its slag from a supplier in the Ural Mountains, 2,600 km. from the Tulachermet plant. Therefore, plaintiff argues, the Russian manufacturer's freight costs are higher than Highveld's, and should be included in the FMV calculation (Memo. in Supp. of Pl.'s Motion for J. Upon the Agency Rec. at 67–70).

Commerce replies that it chose not to calculate freight charges for the slag because the slag price quoted by Highveld is freight-inclusive. "When relying on a surrogate value that is freight-inclusive, the Department's consistent practice has been to accept that value as the surrogate value for the good as delivered to the NME consumer, without any attempt to adjust for alleged differences in freight costs." Final Determination, 60 Fed. Reg. at 27962. "Moreover, a value inclusive of freight represents the level of the surrogate value we intend to reflect—the surrogate price of the good available to the producer at its factory gate." *Id.*

According to the statute, the factors of production to be utilized in valuing merchandise from a NME include, "but are not limited to—(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3) (1988).

The statute does not specify how transportation costs are to be valued. Commerce's interpretation of this provision is reasonable and supported by substantial evidence, including the Highveld price quote.

### 4. Commerce's Currency Conversion Methodology

 Several of the surrogate values Commerce used for the factors of production were from periods before the period of investigation (POI). In order to reconcile pre-POI and POI data, Commerce inflated the non-POI surrogate values to POI levels using the inflation factor for the surrogate country and then converted into US dollars using the exchange rate in .effect during the POI. Shieldalloy contends that Commerce should have converted the non-POI values using the exchange rate in effect during the time to which the values pertain.

In support of its position, Shieldalloy cites 19 C.F.R. § 353.60(a), "[t]he Secretary will convert, under section 522 of the Act (31 U.S.C. § 5151(c)), a foreign currency into the equivalent amount of United States currency at the rates in effect on the dates described in § 353.46, § 353.49, or § 353.50, as appropriate." §§ 353.46, 353.49 and 353.50 refer to cases in which FMV is determined based on a) sales in the home country; b) sales in a third country; and c) constructed value, respectively. Under §§ 353.46 and 353.49, the "dates described" are 1) the time the merchandise is sold for exportation to the United States if United States price is based on purchase price, and 2) the time the merchandise is sold in the United States to an unrelated person if the United States price is based on exporter's sales price. In both instances, the dates described fall within the POI. Under § 353.50, constructed value is to be calculated,

> (1) When United States price is based on purchase price, ... based on the relevant costs and expenses at a time preceding the time the producer or a reseller sells the merchandise for exportation to the United States. (2) When United States price is based on purchase price, ... based on the relevant costs and expenses at a time preceding the time the importer sells the merchandise in the United States to [an unrelated purchaser] ...

Shieldalloy argues that "Since the term 'at the time' merchandise is sold for exportation to, or sold in the United States related to a time during the POI, the term 'at a time preceding the time' merchandise is sold ... must necessarily relate to a time prior to the POI, *i.e.*, the rates in effect during the period(s) to which the publicly available publish-

ed information pertain." (Pl.'s Resp.Br. at 64 f. 149).

Shieldalloy is reading too much into the regulation. In *Consolidated International Automotive, Inc. v. United States*, 16 CIT 1062, 809 F.Supp. 125 (1992), the ITA made currency conversions for constructed value figures as of the date of U.S. sales. The plaintiff argued that currency conversions should be based on rates in existence up to 45 days prior to the date of the U.S. sales because the respondent's invoice promises shipment within 45 days of receiving an order. Thus, the plaintiff argued, the costs used to calculate FMV would be incurred within the 45 days preceding the shipment. The court found ITA's decision to use exchange rates as of the date of sale to be "a reasonable economic and administrative choice." 16 CIT at 1066, 809 F.Supp. at 130.

If the "time of sale" of merchandise sold in the home country or a third country refers to the POI, then it is reasonable to interpret the "relevant costs and values," to mean those costs and values incurred in producing the merchandise to be sold during the POI. Chusavoy, Galt and Tulachermet argue that "in the current case there is little lag time between production and sale. At most a lag of one month exists, ..." (Reb.Br. on Behalf of Chusavoy Metallurgical Works, Vanadium Tulachermet, and Galt Alloys, Inc. at 24).

In light of the evidence on the record that there is little lag time between the production and the sale of the merchandise at issue, Commerce's decision to use exchange rates as of the POI was also "a reasonable economic and administrative choice."

### 5. The Cut-off Date for Applying the Inflation Factor

■ Shieldalloy also objects to Commerce's failure to adjust surrogate values from time periods that overlapped with the POI. For several of the factors of production, including ferrosilicon, lime, aluminum and electricity, Commerce used the average price for the year 1993. The POI ran from December 1993 to May 1994.

Under Title 19, the administering authority, in valuing factors of production for merchandise from a NME is to utilize "the prices or costs of factors of production in one or more market economy countries...." 19 U.S.C. § 1677b(c)(4). The statute does not specify the time period from which the surrogate values are to be taken. According to the Department, "our practice is not to inflate values when the time period of the value—in this case 1993—overlaps with any part of the POI—in this case December 1993." Final Determination, 60 Fed.Reg. at 27963. The Court finds that Commerce's interpretation of the statute here is reasonable. As Commerce explains in its Memorandum, "[b]ecause the surrogate time period overlapped with the period of investigation, the surrogate average prices accurately reflected the actual prices during the period of investigation." In other words, Commerce determined that the values were sufficiently contemporaneous so as not to require adjustment (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at 79).

GfE and Shieldalloy argue that Commerce should have inflated the surrogate values using the ratio between the average price index for 1993 and the average price index for the POI. Final Determination at 27963. This valuation method may also be reasonable. However, "it is a cardinal principle that the Secretary's interpretation of the statute need not be the only reasonable interpretation or the one which the court views as the most reasonable." *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.*, 3 Fed.Cir. (T) 83, 90, 753 F.2d 1033, 1039 (1985). Because the Court finds Commerce's interpretation of the statute to be reasonable, Commerce's determination on this issue is affirmed.

### 6. The use of Galt rather than Hascor or Galt/Hascor as exporter-respondent

■ Galt is engaged in the manufacture and sale of a number of products in the United States. However, Galt has no domestic ferrovanadium production, it is only a seller of the ferrovanadium. During the POI, Galt had an agreement with Hascor BV of the Netherlands, characterized by Galt as

the Galt/Hascor joint venture. According to Galt's submissions to Commerce, Hascor arranged for the purchase of the ferrovanadium in Europe and Galt was responsible for selling the product in the United States.[14] Shieldalloy claims that under this arrangement, Hascor was aware that the merchandise it sold to Galt would be sold in the United States and therefore, Hascor is the proper exporter/respondent of Commerce's investigation.

In its brief Commerce points out that the knowledge test is not applicable when dealing with related parties. Hascor's awareness is therefore irrelevant. The section of the statute that defines "exporter" does not refer to knowledge at all. 19 U.S.C. § 1677(13) (1988).[15] The knowledge test is found in the section on exportation from an intermediate country, and pertains to the calculation of foreign market value. 19 U.S.C. § 1677b(f) (1988).[16]

Instead of applying the knowledge test, Commerce argues, the Court should consider the Congressional intent manifested by provisions of 19 U.S.C. § 1677a. Under that section, Commerce is to use different data to determine United States price depending on whether the exporter and United States purchaser are related or unrelated. According to Commerce, the purpose of this distinction is to prevent exporters from manipulating the dumping calculation. For example, an exporter could sell merchandise at market value to a related party in the United States who could then turn around and sell the merchandise at less than fair value to an unrelated party (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at 74).

In this case, Galt was the first party to sell to an unaffiliated party. "[D]ue to the potential for Galt/Hascor and Galt to mask dumping activity ... Commerce is not interested in the transfer price between Galt and Galt/Hascor," Commerce explained (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at 75). Commerce's argument is persuasive. However, Commerce did not recite this argument in its final determination.

In the Final Determination, Galt commented, "[t]he Department was able to determine that Galt was the first party in the distribution chain *to have knowledge* of the destination of the merchandise and, in fact, was the party that determined that the merchandise was to be sent to the United States." 60 Fed.Reg. at 27960 (emphasis added). Commerce stated simply, "[w]e agree with Galt. Our verification confirmed that Galt is the proper exporter-respondent for its sales because it determines that the merchandise is destined for sale in the United States." *Id.* This agreement indicates that *knowledge* played a role in Commerce's determination.

Accordingly, the issue must be remanded for Commerce to articulate its reasons on the

14. Letter to Susan G. Esserman, Assistant Secretary for Import Administration, from Ross & Hardies (counsel to Galt).

15. "For the purpose of determining United States price, the term "exporter" includes the person by whom or for whose account the merchandise is imported into the United States if—

(A) such person is the agent or principal of the exporter, manufacturer, or producer;

(B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;

(C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or

(D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the ag-

gregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer."

16. "If— ... (2) the manufacturer or producer of the merchandise does not know (at the time of the sale to such reseller) the country to which such reseller intends to export the merchandise,

(3) the merchandise is exported by, or on behalf of, such reseller to a country other than the United States,

...,

such country shall be treated for purposes of this section, as the country from which the merchandise was exported."

record, upon which the parties may then comment.

In its reply brief, Shieldalloy raises one final issue, arguing that Commerce has no basis on which to assume that Hascor and Galt are in fact related parties.

■ According to the verification memo on Galt, Galt sold ferrovanadium produced by Chusavoy to unrelated customers in the United States. Galt did not purchase from Chusavoy directly, however. Chusavoy sold the merchandise to a trading company which resold the merchandise to what is described as "a party related to Galt—a Galt joint venture with the Dutch company Hascor BV." The fact that Galt and Hascor had an agreement which was properly verified on the record is substantial evidence to support Commerce's treatment of them as related.

## II. Issues Raised by Galt

1. **Commerce should have rejected the GfE/Shieldalloy sales response in its entirety because the method of reporting U.S. sales violated DOC standards**

During the course of the administrative proceeding, Shieldalloy reported the actual price it charged per unit of ferrovanadium or nitrided vanadium, and the estimated quantity of Russian merchandise in each sale. (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at 68–69). Shieldalloy said it would be unduly burdensome to search all of its records to identify the exact amount of Russian merchandise in each individual sale, so it used a monthly inventory-turnover methodology to estimate the quantities. According to Commerce, the methodology did not affect the price reported so use of the reported sales·information was appropriate in calculating GfE's dumping margin. Galt argues that Commerce should have applied BIA to GfE, because Shieldalloy's method of reporting its United States sales was unsatisfactory.

■ Commerce replies that Galt lacks standing to raise this issue. As Commerce recognizes, standing has both Constitutional and prudential aspects. *Sacilor, Acieries Et Laminoirs de Lorraine v. United States,* 5 Fed.Cir. (T) 96, 815 F.2d 1488, 1491 (1987).

The Constitutional test for standing comes from Article III of the United States Constitution, which requires that the plaintiff assert a case or controversy. To satisfy this aspect of the standing doctrine, the plaintiff must have experienced an injury-in-fact. In addition, "'the injury must be fairly traceable to the challenged action, and relief from the injury must be likely to follow from a favorable decision.'" *Id.* (quoting *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556). As a direct competitor of Shieldalloy, Galt would suffer injury in fact if Commerce were to calculate Shieldalloy's dumping margin based on distorted or impermissible data. Therefore Galt meets the Constitutional standing requirements.

The prudential aspect of standing requires that the plaintiff show that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question." *Id.* (quoting *Association of Data Processing Serv. Org. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

■ According to the statute, any interested party who was a party to an antidumping duty investigation has the right to appear and be heard as a party in interest before the United States Court of International Trade. 19 U.S.C. § 1516a(d) (1994). The definition of "interested party" includes "a foreign manufacturer, producer, or exporter, or the United States importer, of merchandise which is the subject of an investigation under this subtitle...." 19 U.S.C. § 1677(9)(A) (1994). For purposes of this investigation, Galt was treated like a foreign exporter and therefore has a right to be heard under the statute.

The problem, according to Commerce, is that Galt is not challenging Commerce's determination with respect to its own antidumping margin, it is challenging Commerce's determination with respect to a competitor, thus placing Galt in a position that would usually be taken by the petitioner, who would, by definition be representative of an American industry. *See* 19 U.S.C.

§ 1673a(b)(1) (1994)[17] "The challenged calculations do not affect the rights of Galt, only the rights of Shieldalloy and its related entity GfE." (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at 65). "Shieldalloy has clearly demonstrated that it need not rely upon Galt to litigate its claims." In a footnote, Commerce adds, "Shieldalloy has chosen not to raise this issue and, therefore, Galt does not have the right to assert this claim." *Id.* at 65.

Because the statute grants Galt the right to be heard in this proceeding and does not place any limits upon the issues an interested party can raise, the Court finds that Galt has standing to raise this issue.[18]

On the other hand, the Court does not agree with Galt's arguments on the merits.

██ In the Final Determination, Commerce indicated that Shieldalloy's methodology for reporting sales data "did not affect the prices reported." The statutory definition of exporter's sales price is "the price at which merchandise is sold or agreed to be sold in the United States...." 19 U.S.C. § 1677a(c) (1988). Under the statute, therefore, accurate price data is all that is required. Furthermore, Commerce verified that the sales reporting was complete and said, "we found no indication of any sale-specific distortions deriving from the application of this methodology." Thus the Court finds substantial evidence on the record to support Com-

merce's use of the sales data submitted by Shieldalloy.

## 2. Calculation of overhead expenses for Russian producers

In calculating foreign market value of the subject merchandise, Commerce used German factory overhead values provided by petitioners as a surrogate for Russian factory overhead costs. In its brief, Commerce explained that it was unable to obtain appropriate South African factory overhead data, so it calculated factory overhead using data provided by Shieldalloy about GfE. Galt claims that the overhead expenses reported by GfE were "extraordinarily high," and requests that Commerce verify the reported expenses. Specifically, Galt asks that Commerce investigate and then adjust the factory overhead costs to reflect GfE's higher pollution-control costs and depreciation pursuant to 19 C.F.R. § 353.52.[19]

Commerce replies, "[t]he Department has been unable to locate other, publicly available, data for the factory overhead surrogate value.... Thus, the only available data is the percentages stated in the petition. The respondents' assertions provide an insufficient basis for us to make any adjustments to these percentages." Final Determination, 60 Fed.Reg. at 27962.

In its brief, Commerce argues that § 353.52(b)(2) only requires that it adjust for

---

**17.** "An antidumping proceeding shall be initiated whenever an interested party ... files a petition with the administering authority, on behalf of an industry...."

**18.** Commerce never challenged Galt's standing to raise this issue at the administrative level; instead, Commerce addressed the merits of Galt's argument. *See* Final Determination at 27959. The Court cannot defer to counsel's *post hoc* interpretation of the statute. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 212, 109 S.Ct. 468, 473–474, 102 L.Ed.2d 493 (1988) ("we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.'") (quoting *Investment Company Institute v. Camp,* 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367).

**19.** § 353.52 **Calculation of foreign market value of merchandise from state-controlled-economy countries.**

(a) *In general.* If the Secretary determines that the economy of the home market country is state-controlled ... the Secretary will calculate foreign market value based on, ...

(2) The constructed value of such or similar merchandise in a non-state-controlled-economy country, ...

(b) .... For purposes of paragraph (a), the Secretary will select, in order of preference, prices or costs in:

(2) A non-state-controlled-economy country other than the United States that is not at a stage of economic development comparable to that of the home market country (in which the Secretary will adjust the foreign market value for known differences in the costs of material and fabrication); ....

known differences between Russian and German factory overhead (emphasis added by Commerce) (Memo. in Opp. to Pl.'s Motions for J. Upon the Agency Rec. at ·51). GfE submitted a statement indicating that depreciation was an insignificant factor in its factory overhead, Commerce states, and there is no evidence upon the record regarding the proportion, if any, of the surrogate factory overhead attributable to environmental equipment. Therefore, Commerce argues, there are no· "known" differences for factory overhead upon the record.

Commerce also says it gave the parties ample opportunity to present alternative surrogates, as well as conducting its own search for information from a surrogate country with an economy more comparable to Russia's. *Id.* at 54–54.

■■■ According to the underlying statute, "[t]he administering authority shall verify all information relied upon in making—(1) a final determination in an investigation...." 19 U.S.C. § 1677e(b) (1988). Commerce's regulations also require that the Secretary "verify all factual information the Secretary relies on in ... A final determination." 19 C.F.R. § 353.36(a)(1). The definition of "factual information" includes "(1) Initial and supplemental questionnaire responses; (2) Data or statements of fact in support of allegations; (3) Other data or statements of facts; and (4) Documentary evidence." 19 C.F.R. § 353.2(g).

The statutory provision on ·verification was discussed by the court in *Timken Co. v. United States,* 12 CIT. 955, 699 F.Supp. 300 (1988). In that case, the plaintiff, an American producer, objected to Commerce's use of unverified surrogate values from India to calculate FMV for tapered roller bearings (TRBs) from China. Commerce had already turned down information offered by the plaintiff's Indian business partner on the grounds that the information lacked the "requisite indicia of reliability." Instead, Commerce used cost information acquired from the U.S. Consulate in Bombay. The Consulate's data were unverifiable because the Indian government refused to participate in the investigation.

The plaintiff argued that once the Indian government refused to verify the· Consulate data, Commerce was obligated to use information from a different, surrogate country. Commerce refused to do this, because there was no other market-economy country producing TRBs with an economy that was comparable to China's. The court upheld Commerce's use of the Indian information.

It is ... permissible for Commerce to employ unverified data from the designated surrogate as the "best information otherwise available," absent serious defect in the comparable surrogate selection process or *Commerce's* prejudicial error in conducting verification. Plaintiff neither challenges India's status as a comparable surrogate nor argues that Commerce failed to make verification attempts in India. The Court finds therefore that Commerce was justified in adopting the unverified Indian data as the "best information otherwise available."

Based on the reasoning in *Timken,* the court affirms Commerce's use of the factory overhead percentages provided by petitioner. Commerce made a significant effort to obtain factory overhead · information from a more appropriate surrogate country and Galt has failed to provide any evidence of serious defect in Commerce's determination. *See Fujitsu General Limited v. U.S.,* 88 F.3d 1034, 1044 (1996) (rejecting challenge to Commerce's determination when Plaintiff failed to produce evidence to support its "broad, disputed assertion that Commerce's practice is not in accordance with GAAP [generally accepted accounting principles]").

## CONCLUSION

After consideration of issues raised by both Shieldalloy and Galt, the Court holds that the issues of the use of Tulachermet's factors of production values to calculate foreign market value for Odermet; Commerce's method of adjusting the surrogate value of vanadium slag, and Commerce's use of Galt rather than Galt/Hascor or Hascor alone as exporter respondent, are remanded for further explanation by Commerce. On the remaining issues, this Court affirms Commerce's determinations.

## ORDER

This case having been submitted for decision and the Court, after due deliberation, having rendered a decision herein; in conformity with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration, to correct the misleading language that appears in the Final Determination regarding calculation of the surrogate price of vanadium slag; and to explain its use of Tulachermet's factors of production data to calculate foreign market value for Odermet, and its use of Galt as exporter-respondent; and it is further

**ORDERED** that remand results are due within sixty (60) days of the date this order is entered; comments and responses are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days after the date comments or responses are due; and it is further

**ORDERED** that plaintiffs' motions for judgment upon the agency record are denied in all other respects.

