**Slip Op. 03-16**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Judge Judith M. Barzilay**

------------------------------------------------------------------x
                                                                   :
CHINA NATIONAL MACHINERY
IMPORT & EXPORT CORPORATION,                                       :

                              Plaintiff,                           :

              v.                                                   :    Court No. 01-01114

UNITED STATES,                                                     :    **Public Version**

                              Defendant,                           :

                    and                                            :

THE TIMKEN COMPANY,                                               :

                    Defendant-Intervenor. :

---------------------------------------------------------------- x

[Plaintiff's Motion for Judgment upon an Agency Record is denied in part, granted in part, and the case is remanded.]

                                        Decided: February 13, 2003

*Crowell & Moring L.L.P., (Jeffrey L. Snyder), Alexander H. Schaefer*, for Plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General, United States Department of Justice, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, *Lucius B. Lau,* Assistant Director, (*Ada E. Bosque*), Trial Attorney; *Scott D. McBride*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

*Stewart and Stewart, Terence P. Stewart, (Wesley K. Caine), Amy A. Karpel*, for Defendant-Intervenor.

## OPINION

**BARZILAY, JUDGE:**

### I. INTRODUCTION

Before the court is Plaintiff China National Machinery Import & Export Corporation's ("CMC") Motion for Judgment upon an Agency Record pursuant to USCIT R. 56.2. CMC challenges certain aspects of the United States Department of Commerce's ("Commerce" or "Defendant") determination in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of 1999-2000 Administrative Review, Partial Rescission of Review, and Determination Not to Revoke Order in Part*, 66 Fed. Reg. 57,420 (Nov. 15, 2001) ("*Final Results*"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

### II. BACKGROUND

Plaintiff CMC is an exporter of tapered roller bearings and parts thereof, finished and unfinished ("TRBs"), from the People's Republic of China ("PRC" or "China") to the United States. The antidumping duty order concerning TRBs from the PRC was issued on May 27, 1987. *See Tapered Roller Bearings from the People's Republic of China; Final Determination of Sales at Less Than Fair Value*, 52 Fed. Reg. 19,748 (May 27, 1987). Commerce designated the PRC as a non-market economy ("NME") country.[1] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Preliminary Results of*

---

[1] An NME country is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A) (1999). There is no dispute here as to the PRC's NME status.

*1999-2000 Antidumping Duty Administrative Review, Partial Rescission of Review, and Notice of Intent Not to Revoke Order in Part*, 66 Fed. Reg. 35,937, 35,938 (July 10, 2001) ("*Preliminary Results*"). At issue in this case are the 1999-2000 sales of TRBs from the PRC, which constitute sales made during the thirteenth administrative review of the antidumping duty order ("POR"). Specifically, CMC challenges Commerce's rejection of the actual market prices that CMC paid for steel used in the production of the TRBs, in favor of using surrogate values for steel in the final calculation of normal value ("NV") to determine dumping margins.[2]

On July 7, 2000, Commerce published the preliminary results of the twelfth administrative review, which showed a zero dumping margin for CMC. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of 1998-1999 Administrative Review, Partial Rescission of Review, and Notice of Intent to Revoke Order in Part*, 65 Fed. Reg. 41,944, 41,949 (July 7, 2000). On July 31, 2000, Commerce initiated the thirteenth administrative review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in*

---

[2] "The term 'dumping margin' means the amount by which the normal value exceeds the export price . . . of the subject merchandise." 19 U.S.C. § 1677(35)(A). "Subject merchandise" is merchandise subject to an antidumping investigation, review or order. § 1677(25). "Normal value" is "the price at which the [subject merchandise or its equivalent] is first sold (or . . . offered for sale) for consumption in the exporting country." § 1677b(a)(1)(B)(i); § 1677(16). "The term 'export price' means the price at which the subject merchandise is first sold (or agreed to be sold) . . . in the United States." § 1677a(a). The dumping margin is thus the difference between the domestic price and the United States price of the subject merchandise. In the case of an NME exporting country, the domestic price will not be market determined, and the normal value must accordingly be constructed. The statute provides that the values for factors of production used in the construction of normal value for exports of an NME country will be those of a market economy country of comparable economic development, the so-called surrogate. *See* § 1677b(c).

*Part*, 65 Fed. Reg. 46,687 (July 31, 2000), *amended by* 65 Fed. Reg. 48,968 (Aug. 10, 2000).

On February 26, 2001, Commerce published the amended final results of the twelfth

administrative review, which reflected a jump from zero to 0.82% (despite remaining *de

minimis*)[3] of CMC's dumping margin determined in the preliminary. *See Tapered Roller

Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China;

Amended Final Results of 1998-1999 Administrative Review and Determination to Revoke in

Part*, 66 Fed. Reg. 11,562, 11,564 (Feb. 26, 2001). Commerce changed its methodology

regarding the prices for steel input in mid-review in the twelfth administrative review.[4]

On July 10, 2001, Commerce published the preliminary results of the thirteenth

administrative review. *See Preliminary Results*. Commerce found a 4.79% dumping margin for

CMC in this preliminary investigation and therefore denied CMC's revocation request. *See id.* at

35,941. On November 15, 2001, Commerce published the final results and found a 4.64%

dumping margin for CMC. *See Final Results* at 57,422. Commerce's reasons for its

determinations are found in the accompanying *Issues and Decision Memo for the 1999-2000

Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,

from the People's Republic of China; Final Results* ("*Issues and Decision Memo*"), A-570-601,

Pub. Doc. DAS I/1:JG (Nov. 7, 2001), in app. 14 to *Pl.'s Mem. in Supp. of Mot. for J. upon an*

---

[3] "[A] weighted average dumping margin is de minimis if [Commerce] determines that it is less than 2 percent ad valorem or the equivalent specific rate for the subject merchandise." 19 U.S.C. § 1673b(b)(3).

[4] The results of the twelfth administrative review of the antidumping duty order (concerning 1998-1999 sales) are challenged in a separate action before another judge of this Court. The issues raised in both actions are similar as they pertain to the same methodology Commerce employed in both the twelfth and thirteenth administrative reviews.

*Agency R.* ("*Pl.'s Br.*").  As it cannot meet the standard of three consecutive years of sales at not less than fair value, *see* 19 C.F.R. § 351.222(b)(1)(i)(A) (2000), CMC remains subject to the antidumping duty order regarding TRBs from the PRC.

The merchandise at issue here is cups and cones which CMC sold in the United States. *Tr.* at 10:21-25 to 11:1-6.[5]  To manufacture cups and cones, CMC used hot-rolled alloy steel bar which it imported from another country paying in market currency.[6]  *Pl.'s Br.* at 9.  CMC thus challenges Commerce's use of surrogate values for its hot-rolled alloy steel bar input instead of the actual price it paid.  There is no indication on the record, nor is there an argument in the parties' briefs that CMC and its supplier are affiliated.  The exporting country is a market economy country.  Normally, to construct NV for the final product, Commerce uses actual prices which an NME producer pays for the input from a market economy country since actual market prices are the best approximation of the input's value.  *See* 19 C.F.R. § 351.408(c)(1).  However, in this case, both in the final stage of the twelfth administrative review and in the entire thirteenth administrative review, Commerce declined to use the actual prices CMC paid to the supplier for its steel because it claimed it had a "reason to believe or suspect" that the supplied steel was benefitting from subsidies, and the actual prices were thus distorted.  *See Preliminary*

---

[5] On November 14, 2002, oral argument was held before this court.  "*Tr.*" refers to the transcript of this oral argument.

[6] CMC imported hot-rolled alloy steel bar from [[ ]].
The name of the exporting country and the identity of CMC's supplier are confidential and set in double brackets.  During the POR, CMC's shipments to the United States also included assembled TRBs with cups, cones, rollers, and cages together.  *Pl.'s Br.* at 9.  To manufacture cages, CMC's supplier used cold-rolled steel sheet imported from [[ ]]
again paying in market currency.  *Id.*  To manufacture rollers, CMC used cold-rolled steel bar obtained domestically in the Chinese market.  *Id.*

*Results* at 35,940; *Issues and Decision Memo* at 9**.**  To support its finding that the steel was subsidized, Commerce relied on an internal confidential memorandum, *Market Economy Steel Memo* (Nov. 7, 2001), in app. 4 to *Pl.'s Br*.

The *Market Economy Steel Memo* lists various affirmative antidumping and countervailing duty findings applying to various steel products from the market economy country at issue.[7]  Also listed in the *Market Economy Steel Memo* is a negative finding from 1999 relating to one particular steel product, [[                                               ]], from the market economy country: *Final Negative Countervailing Duty Determination:* [[

                                                                                ]] ("*Final Negative Determination*").  There are no specific antidumping or countervailing duty findings regarding the hot-rolled alloy steel bar that is at issue here.  *See Market Economy Steel Memo*; *Tr.* at 11:7-11.  However, during these antidumping or countervailing duty investigations, Commerce "discovered . . . not company specific" but generally available subsidies to steel producers in the concerned country, including directed credit, export industry facility loans, short-term export financing, and investment tax credits.  *Market Economy Steel Memo.*  Commerce maintains without further elaboration that "in two of the three recent [pertinent] investigations, [these general subsidies] are greater than *de minimis*."  *Tr.* at 16:2-4.  There is no record evidence of a generally available subsidy verified in the case of hot-rolled alloy steel bar from the country in

---

[7] For example, Commerce found in 1999 that [[
              ]] exports from the exporting country in question were being dumped in the United States.  In addition, in 2000 and 1999, respectively, Commerce determined that [[
                                        ]] exports were being subsidized.  There is also an affirmative preliminary dumping finding by the PRC of [[                                         ]] from that country.

question as Commerce has never specifically investigated this merchandise. *See Market Economy Steel Memo*. In addition, Commerce never specifically verified whether CMC's supplier had ever taken advantage of any generally available subsidies for this or any other steel product. *See Tr.* at 17:21-25 to 18:1-16. Commerce nevertheless believes that CMC's supplier may have (or must have) benefitted from generally available subsidies resulting in a distortion in the prices of hot-rolled alloy steel bar and, therefore, such prices cannot properly be used in the NV calculations for the cups and cones CMC sold in the United States. The contention is that "as a matter of commonsense, we can assume that no one is going to leave money on the table. [Companies] are going to take advantage of a program that's out there and exists." *Tr.* at 30:24-25 to 31:1-3.

Given the designation of the PRC as an NME country, Commerce resorted to surrogate country analysis pursuant to its authority under 19 U.S.C. § 1677b(c)(4).[8] Accordingly, Commerce selected India as surrogate and used adjusted weighted-averages of Japanese export prices to India for hot-rolled alloy steel bar based on the Japanese Ministry of Finance statistics. *See Preliminary Results* at 35,940. Commerce explained the selection of India as the surrogate country by pointing out that India was at a comparable level of economic development with the PRC and was the most significant producer and exporter of TRBs among other suitable

---

[8] Section 1677b(c)(4) provides that:

> [Commerce], in valuing factors of production . . . , shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are–
> > (A) at a level of economic development comparable to that of the nonmarket economy country, and
> > (B) significant producers of comparable merchandise.

countries, such as Pakistan, Indonesia, Sri Lanka, and the Philippines.[9]  *See Selection of a Surrogate Country and Steel Value Sources Memo* at 3 (July 2, 2001) (*"Surrogate Country Memo"*), in app. 14 to *Pl.'s Br.*; *see also* 19 C.F.R. § 351.408(b) (basing comparability on *per capita* GDP).  Finding India's own import statistics "unreliable," however, Commerce instead chose Japanese export data to India as "the best data" because "the Japanese tariff category [was] the narrowest category which could contain bearing quality steel, and because it [was] consistent with values contained in our U.S. benchmark category."  *Surrogate Country Memo* at 3; *see also Def.'s Mem. in Opp. to Pl.'s Mot. for J. upon an Agency R.* at 4 (*"Def.'s Br."*).

After the preliminary results were released, CMC submitted rebuttal evidence to Commerce in the form of a letter from its supplier which denied the existence of any subsidies or financial assistance, direct or indirect, from its government in its production of steel sold to CMC.  *See Pl.'s Br.* at 10; *Tr.* at 12:8-11.  CMC charges that Commerce ignored this evidence submitted by CMC.  *See Pl.'s Br.* at 26.  Commerce counters that the letter was insufficient to "refute[] [Commerce's] reason to believe or suspect subsidization" since it was unsupported by "sales, financial, or other empirical economic information demonstrating the supplier's prices were not subsidized."  *Issues and Decision Memo* at 8; *see also Tr.* at 13:17-19.  "The statement also lack[ed] any specificity, particularly as it [did] not indicate the basis upon which the supplier [made] its statement."  *Issues and Decision Memo* at 8.  Commerce further argues that, in addition to being general, the letter was not "directed to Commerce.  There [was] no

---

[9] Even though in the briefs submitted to this court Plaintiff never fully explained nor argued the point, Plaintiff maintains that if any surrogate were to be used Indonesia would have been a better choice.  *See Tr.* at 14:6-22.  Plaintiff's claim is that Indonesian prices would not have exceeded the benchmark range as much as Indian values did.  *See id.*

indication . . . of what . . . the duties and responsibilities of the letter writer [were] and why he would have knowledge of what subsidies the company did or did not take advantage of." *Tr.* at 23:17-22. The letter also consisted of "two sentences," *Tr.* at 24:4, and was not "in the form of an affidavit," *Tr.* at 33:13-14.[10]

On January 11, 2002, CMC filed its complaint ("*Compl.*") with this court. First, CMC challenges in general Commerce's use of surrogate values in place of actual prices paid by CMC for the input. *Compl.* ¶ 6-A. Second, CMC challenges in particular Commerce's use of prices of steel imported from Japan to India to value cups and cones. *Compl.* ¶ 6-B. In addition, CMC challenges Commerce's adjustment of the Japanese prices for freight and insurance costs which were not included in the prices. *Compl.* ¶ 6-C. CMC claims Commerce's determinations are "arbitrary, capricious, unsupported by substantial evidence on the record, and [are] otherwise not in accordance with law." *Compl.* ¶ 6. The Timken Company ("Timken") is the Defendant-Intervenor in this case.

---

[10] The letter titled "Subsidy Statement," addressed "To whom it may concern," dated August 24, 2001, and signed by the general manager of the company's overseas sales department is found in appendix 6 of *Pl.'s Br.* It reads in its entirety:

We have reviewed the participation of [[                    ]] in the programs the US Department of Commerce has considered in the past to constitute countervailable subsidies within the meaning of the US countervailing duty law. Upon review, [[        ]] did not receive benefits from any of those programs in our sales to China.

### III. Discussion

The antidumping duty statute requires Commerce to use "the best available information" concerning the values for factors of production from a market economy in the NV calculations for product exported from an NME country. 19 U.S.C. § 1677b(c)(1) (1999).[11] "The statute does not define the phrase 'best available information.'" *Luoyang Bearing Factory v. United States*, 26 CIT __, __, Slip Op. 02-118 at 4 (Oct. 1, 2002). CMC argues that the statutory mandate to use the best available information directs Commerce to utilize "actual prices paid to market economy suppliers [over] surrogate values." *Pl.'s Br.* at 15. As support, CMC relies on *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994), which noted that "'[w]here we can determine that a [sic] NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law'" (quoting Commerce's determinations in the same case, *Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed. Reg. 55,271, 55,275 (Oct. 25, 1991) (final determination)). *Pl.'s Br.* at 16; *see also Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382-83 (Fed. Cir. 2001) (echoing *Lasko*'s reasoning).

CMC further argues that Commerce's own regulations compel the use of actual market

---

[11] Section 1677b(c)(1) in pertinent part provides that:
> [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

values over surrogate values. *See Pl.'s Br.* at 17. The applicable regulation is 19 C.F.R. §

351.408(c)(1), which states that "where a factor is purchased from a market economy supplier

and paid for in a market economy currency, [Commerce] *normally* will use the price paid to the

market economy supplier" (emphasis added). CMC contends that the "only" exception to this

rule is "where the quantity of the input purchased was insignificant."[12] *Pl.'s Br.* at 17-18; *Pl.'s*

*Reply to Def.'s Br.* at 3.

Commerce responds that the antidumping duty statute does compel Commerce to use

"the best available information," but not necessarily market values. *Def.'s Br.* at 10. Commerce

---

[12] The court notes that, as support for this proposition, CMC mistakenly quotes *Rules and Regulations: Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997) ("*Final Rule*"), which document contains explanations of Commerce's new rules revised in conformity with the Uruguay Round Agreements Act, including 19 C.F.R. § 351.408(c)(1). According to CMC, the *Final Rule* states on its page 27,413 that "[t]he *only* situation in which [the Department] would not rely on the price paid by an NME producer to a market economy supplier is where the quantity of the input purchased was insignificant." *Pl.'s Br.* at 17-18 (emphasis in the original). Given that this quote is one of the cornerstones of its argument, CMC's mistake is unfortunate. The *Final Rule* merely states on its page 27,366 that "as noted in the AD Proposed Regulations, 61 [Fed. Reg. 7308,] 7345, we would not rely on the price paid by an NME producer to a market economy supplier if the quantity of the input purchased was insignificant." *See also Proposed Rules: Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7345 (Feb. 27, 1996) ("where the amount purchased [by an NME producer] from a market economy supplier is insignificant, [the] price [paid to the market economy supplier] may be disregarded."). Without more, the "only" language simply cannot be read into the *Final Rule* and, accordingly, into Commerce's understanding of its own regulations as reflected in the *Final Rule*. The court notes, however, that the same language appears in another case. *See Certain Helical Spring Lock Washers from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 61,794, 61,796 (Nov. 19, 1997) (containing the same quote supplied by CMC and citing to the *Final Rule* at 27,366). That is, in at least one occasion, Commerce agreed with Plaintiff that the only situation that permitted a deviation from the use of readily available market prices was when the quantity of input sold by the market supplier was insignificant. What Commerce said or did in another case does not, however, have the same persuasive value in this case as a pronouncement in the *Final Rule* would have had.

argues that it has "broad discretion to determine the 'best available information' in a reasonable manner upon a case-by-case basis." *Id.* at 11. Commerce further argues that "Congress instructed Commerce to avoid using any prices 'which it has reason to believe or suspect may be dumped or subsidized prices.'" *Def.'s Br.* at 12 (quoting H.R. Conf. Rep. No. 100-576 at 590 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623 ("*House Report*")). Timken adds to this argument by observing that "Congress did not intend for Commerce to conduct formal investigations before rejecting unfair prices."[13] *Def.-Intervenor's Resp. to Pl.'s Mem. in Supp. of Mot. for J. upon an Agency R.* at 18. Finally, with respect to 19 C.F.R. § 351.408(c)(1), Commerce contends that while, through the inclusion of the word "normally," the "regulation evinces a preference for the use of market values, that preference does not require Commerce to use market values in all circumstances." *Def.'s Br.* at 17. Commerce concludes that "[h]ere, the use of market prices [was] not appropriate because those prices [were] distorted." *Id.*

CMC objects to Commerce's resort to the "reason to believe or suspect" standard under these facts. *See Pl.'s Br.* at 20. According to CMC, the *House Report* from which Commerce derived the "reason to believe or suspect" standard relates only to a selection among surrogate values, not to the selection of surrogate values over market prices. *See id.* at 20-21. Thus,

---

[13] The *House Report* further stated that:

> However, the conferees do not intend for Commerce to conduct a <u>formal investigation</u> to ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time. In addition, Commerce should seek to use, if possible, data based on production of the same general class or kind of merchandise using similar levels of technology and at similar levels of volume as the producers subject to investigation.

*House Report* at 590-91 (emphasis added).

Plaintiff urges that the "reason to believe or suspect" standard would not be applicable where market prices are available. *See id.*

A.      Commerce's use of certain surrogate prices over actual prices of inputs in NV calculations under the statute.

"The court's role is not to determine whether the information chosen by Commerce is the 'best' actually available, but whether the choice is supported by substantial evidence and is in accordance with law." *Novachem, Inc. v. United States*, 16 CIT 782, 786, 797 F. Supp. 1033, 1037 (1992) (citations omitted). Accordingly, the first issue before the court is whether Commerce's use of surrogate input values instead of the actual prices paid by an NME producer to a market economy supplier is in accordance with law where Commerce has "reason to believe or suspect" that the actual prices are distorted.

The court agrees with Commerce that nothing in the antidumping duty statute directs Commerce to employ actual prices paid to a market economy supplier by an NME producer in NV calculations. Under the antidumping duty statute, "Commerce's duty [is] to determine margins as accurately as possible, and to use the best information available to it in doing so." *Lasko*, 43 F.3d at 1443; *Allied-Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1190 (Fed. Cir. 1993); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Commerce has especially "wide discretion in the valuation of factors of production." *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999). The statute "simply does not say–anywhere–that the factors of production must be ascertained in a single fashion." *Lasko*, 43 F.3d at 1446; *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 102 F. Supp. 2d 486, 491 (2000), *aff'd*, 268 F.3d 1376 (2001). Commerce's

methodology in selecting values for factors of production will be upheld, as long as such

methodology does not contravene "the purpose of the statute, [which is] to construct the

product's normal value as it would have been if the NME country were a market economy

country." *Rhodia, Inc. v. United States*, 25 CIT __, __, 185 F. Supp. 2d 1343, 1351 (2001)

(citations omitted). The statutory term "best available information" is at best an ambiguous

term. *See* § 1677b(c)(1). When the statute is ambiguous on a point, the court must uphold an

agency's reasonable constructions of the statute. *Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc.,* 467 U.S. 837, 843 (1984). In particular, "statutory interpretations

articulated by Commerce during its antidumping proceedings are entitled to judicial deference

under *Chevron*." *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed.

Cir. 2001); *see also Allied-Signal*, 996 F.2d at 1191 (observing that "because Congress has

'explicitly left a gap for the agency to fill' in determining what constitutes the best information

available [(which phrase appeared in 19 U.S.C. § 1677e(c) (1988)), Commerce's] construction of

the statute must be accorded considerable deference" under *Chevron*).

Contrary to CMC's contention, the *Lasko* decision cannot be construed as requiring

Commerce to employ actual prices (paid by an NME producer to a market economy supplier)

over surrogate values in every situation. In *Lasko*, Commerce won the right to use market prices

instead of surrogate values for factors of production in NV calculations on the rationale that

"accuracy, fairness, and predictability are enhanced by using those prices." *Lasko*, 43 F.3d at

1446. Where actual prices reflect true market values, not to employ such prices would indeed be

contrary to Commerce's mandate of estimating antidumping duty "margins as accurately as

possible." *Id.* at 1443. If the prices CMC paid to its supplier for the steel input were artificially

low, however, due to subsidies it was receiving from the government, then the calculated NV for the end product, TRBs, would be artificially low, suppressing the dumping margins of CMC. Thus, if CMC were indeed dumping in the United States, that fact would have been concealed by the artificially low NV. If actual "market" prices are distorted in such a way, Commerce's use of such prices would undermine "accuracy, fairness, and predictability," *id.* at 1446, in the calculation of margins and contravene the antidumping and countervailing duty statute, the purpose of which is to correct for the effect dumping and subsidies have on prices and competition.

Moreover, nothing in the applicable regulations compels Commerce to choose actual prices over surrogate values. As Commerce urges, 19 C.F.R. § 351.408(c)(1) merely indicates a preference for market prices. That is, while Commerce will use market values under normal circumstances, under certain circumstances Commerce may choose not to do so. The court rejects the argument that Commerce may deviate from this practice only when quantities of input purchased are insignificant. Section 351.408(c)(1) itself does not supply the exceptional circumstances under which Commerce may disregard market prices. In explaining § 351.408(c)(1), Commerce had indicated that one situation where it "would not rely on the price paid by an NME producer to a market economy supplier [is where] the quantity of the input purchased was insignificant." *Rules and Regulations: Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (May 19, 1997). That cannot, however, be the only situation when a deviation from the normal practice of using market prices is permissible.

It is true, as CMC urges, that the "reason to believe or suspect" standard articulated in the *House Report* explicitly refers only to a selection among surrogate prices, as opposed to a choice

between surrogate and market values. This Court and the United States Court of Appeals for the

Federal Circuit have, in addition, upheld Commerce's use of the "reason to believe or suspect"

standard in the context of a choice among surrogate values and affirmed Commerce's refusal to

use distorted surrogate values. *See Nation Ford*, 166 F.3d at 1377-78; *Rhodia,* 185 F. Supp. 2d

at 1352; *Technoimportexport, UCF Am. Inc. v. United States*, 16 CIT 13, 17, 783 F. Supp. 1401,

1405 (1992). "Evidently, the main consideration is the unreliability of the price information due

to the unknown dumping margin if any." *China Nat'l Metals & Minerals Imp. & Exp. Corp. v.*

*United States*, 11 CIT 859, 864, 674 F. Supp. 1482, 1486 (1987). Such a consideration would,

however, also be pertinent whenever market values are involved. There are also policy concerns

on each side of this issue. The policy in favor of determining margins as accurately as possible

weighs against further use of the "reason to believe or suspect" standard. On the other hand,

given that the overarching purpose of the antidumping and countervailing duty law is to

counteract dumping and subsidies, the court cannot conclude that Congress would condone the

use of any value where there is "reason to believe or suspect" that it reflects dumping or

subsidies. "[S]urrogate country values are, at best, an *estimate* of the true value of the factors of

production" and, therefore, not precise. *Shakeproof*, 268 F.3d at 1382 (emphasis in original)

(citation omitted). However, if Commerce had "reason to believe or suspect" that steel used by

CMC in the production of the TRBs sold in the United States were subsidized, Commerce may

employ surrogate values where it determines that they are the best information under the

statute.[14]

---

[14] Commerce may also choose among surrogates which fit the requirements of
§ 1677b(c)(4). *See Shieldalloy Metallurgical Corp. v. United States*, 20 CIT 1362, 1368, 947 F.

B.       Commerce's use of the reason to believe or suspect standard in the case of certain
         subsidies is unsupported by substantial evidence.

The second question before the court is whether, in this case, Commerce's actions are

supported by substantial evidence that would have given Commerce "reason to believe or

suspect" that the steel used by CMC in the production of the TRBs sold in the United States was

subsidized.

---

Supp. 525, 532 (1996) ("Commerce does not need to prove that its methodology was the only way, or even the best way to calculate surrogate values for" subject merchandise.). Such choices will be upheld as long as they are reasonable. *See Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 118, 44 F. Supp. 2d 229, 258 (1999). CMC failed to fully articulate to this court why Indonesia would have been a better choice as a surrogate than India, other than claiming that Indonesian values would not have exceeded the U.S. benchmark range as much as Indian values did. Commerce found that both India and Indonesia were of comparable economic development to the PRC and explained that India was selected over Indonesia (and over other suitable surrogates) because it was "the most significant producer and exporter of tapered roller bearings." *Selection of a Surrogate Country and Steel Value Sources Memo* at 2 (July 2, 2001), in app. 14 to *Pl.'s Br*. Commerce's action was consistent with the statutory mandate under § 1677b(c)(4), to choose a "significant producer" of the merchandise as a surrogate. Therefore, Commerce was within its discretion to use Japanese export data to India, as opposed to any Indonesian values. *Cf. Luoyang Bearing Factory v. United States*, 26 CIT __, __, Slip Op. 02-118 at 4 (Oct. 1, 2002) (pointing out that Commerce has discretion to switch from primary to secondary surrogate data). Similarly, Commerce may adjust data by adding ocean freight and marine insurance costs ("F&I"), as long as such adjustment is reasonable. Here, the base values Commerce used were F.O.B. Japanese export prices. "F.O.B." or "Free-On-Board" prices do not include F&I whereas "C.I.F." or "Cost-Insurance-and-Freight" prices do. *See* International Chamber of Commerce, Incoterms 2000 49, 65 (1999). The F&I data used in the adjustment was that from the PRC to the United States west coast. *See Issues and Decision Memo* at 14. Commerce claims that this data was "the best available information [that] most closely approximate[d] the shipping distance between Japan and India." *Id.* CMC argues that the F&I used in the adjustment was approximately three times the difference between F.O.B. and C.I.F. Japanese values and, therefore, such adjustment was unreasonable. *See Pl.'s Br.* at 28-29. Even though subtracting F.O.B. values from C.I.F. values may be one method of extracting F&I, it is not the only method, and it is not the method Commerce chose to employ here. Plaintiff has not shown to this court why Commerce's adjustment methodology is unreasonable. We need not, however, decide this difficult issue as Commerce's basic decision must be remanded as unsupported by substantial evidence.

The "reason to believe or suspect" standard that is argued here has no statutory

definition. In attempting to define a similar phrase, "reasonable grounds to believe or suspect,"

which appears in 19 U.S.C. § 1677b(b)(1) (1999),[15] this Court observed that "in order for

reasonable suspicion to exist there must be 'a particularized and objective basis for suspecting'

the existence of certain proscribed behavior, taking into account the totality of the

circumstances– the whole picture." *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245,

247, 575 F. Supp. 1277, 1280 (1983) (quoting from criminal law cases that analyzed the

"reasonable suspicion" standard for searches pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968)). This

insistence on "a particularized and objective basis" has been interpreted to mean a "'demand for

specificity.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981), and also citing

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320-21 (1978), for the proposition that "probable cause

in the administrative law context is established by *specific* evidence" (emphasis in the

original)).[16] Therefore, the "reason to believe or suspect" standard at issue here must be

predicated on particular, specific, and objective evidence.

On the other hand, substantial evidence is "more than a mere scintilla;" it is "such

---

[15] "Whenever [Commerce] has reasonable grounds to believe or suspect that sales of [the subject merchandise or its equivalent] for the determination of normal value have been made at prices which represent less than the cost of production of that product, [Commerce] shall determine whether, in fact, such sales were made at less than the cost of production." § 1677b(b)(1).

[16] The court notes that the exact quote from *Marshall* is: "For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'" 436 U.S. at 320 (quotation omitted) (footnote omitted).

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec.*

*Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). "For purposes of judicial

review, the evidence before this Court is limited to the evidence contained in the administrative

record." *Kerr-McGee Chem. Corp. v. United States*, 21 CIT 1353, 1361, 985 F. Supp. 1166,

1173 (1997) (citations omitted). In applying the "substantial evidence" standard, "the court

affirms [an agency's] factual determinations so long as they are reasonable and supported by the

record as a whole, even if there is some evidence that detracts from the agency's conclusions."

*Olympia Indus., Inc. v. United States*, 22 CIT 387, 389, 7 F. Supp. 2d 997, 1000 (1998) (citing

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984)).

Merging the two standards and under the facts of this case, the court will accordingly

affirm Commerce's actions if, given the entire record as a whole, there is substantial, specific,

and objective evidence which could reasonably be interpreted to support a suspicion that the

prices CMC paid to its market economy supplier were distorted. Otherwise, this court may not

reweigh the evidence or substitute its own judgment for that of the agency. *See Granges*

*Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21 (1989) (citation

omitted). Additionally, the agency is presumed to have considered all of the evidence in the

record, and the burden is on the plaintiff to prove otherwise. *Roses, Inc. v. United States*, 13 CIT

662, 668, 720 F. Supp. 180, 185 (1989); *Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771,

779, 696 F. Supp. 642, 648 (1988).

To support its contention that there is substantial evidence in the record, Commerce

argues that the discovery of subsidies which are not company specific in the investigations of

other steel products gave it reason to infer that CMC's supplier alongside other steel producers in the relevant country may have benefitted from these so-called general subsidies. *See Def.'s Br.* at 15. Commerce further argues that "the letter [from CMC's supplier], at most, created a conflict in the record," to which Commerce was entitled to give "minimal weight." *Id.* at 16.

CMC, on the other hand, points to contradictory evidence. First, "there are no current or prior countervailing duty orders in the United States or in China on the material input in question, hot-rolled bars and rods of bearing quality steel manufactured in [the exporting country]." *Pl.'s Br.* at 25 (citing *Market Economy Steel Memo*). Second, not only the steel input in question, but also CMC's supplier was never investigated in any recent countervailing or antidumping duty investigations. *See id.* Third, "[i]n a recent countervailing duty case on [a steel input from the exporting country, Commerce] made a final negative countervailing duty determination." *Id.* (citing *Final Negative Determination*). According to CMC, this finding would "obviously militate[] against the notion that there are 'industry-wide' subsidies conferring benefits on manufacturers of steel products." *Id.* at 25-26.

CMC is correct. Evidence exists in the record – Commerce's own negative finding for one steel product from the country at issue – compelling the conclusion that all steel products from that country could not have benefitted from general subsidies. *See Final Negative Determination*. This evidence is not merely a contradictory piece of evidence to which Commerce is entitled to give minimal weight. On the contrary, this evidence directly undermines Commerce's justification of using surrogate values in CMC's case. If this specific finding is an anomaly, Commerce must explain to this court why it is an anomaly. Otherwise, Commerce cannot reasonably claim that, if one or two steel products in the exporting country

were subsidized, then all must have been because at least one was found by Commerce itself not to have been subsidized. Conjectures are not facts and cannot constitute substantial evidence. *China Nat'l Arts and Crafts Imp. and Exp. Corp. v. United States*, 15 CIT 417, 424, 771 F. Supp. 407, 413 (1991) ("Guesswork is no substitute for substantial evidence in justifying decisions."). In this case, it may be that there in fact exists a countervailable subsidy program to support steel producers in the country in question, but CMC's supplier might not have qualified for this program and, therefore, could not have benefitted from it. There is no indication on this record whether this program is offered across the board to all steel producers in the country, to those of a certain size, to those which manufacture a certain product or set of products, to those in a specific geographical area or so on. Without explaining more of the program and without explaining, for example, who could benefit from the program or whether companies may choose not to participate (for example, because the program comes with certain obligations), the contention that all steel producers must have benefitted from the program is logically unsupportable.

Moreover, even the existence of a sufficiently significant general subsidy program is in question here. This court raised the issue with counsel at oral argument. The numbers that appear in the *Market Economy Steel Memo* that allegedly indicate the existence of a subsidy program appear to be very low numbers. The court was concerned that, even if there is an available steel subsidy program in the country in question, its effects are minimal and do not rise to the level of a distortion which Commerce must address. Neither Commerce in the administrative proceedings, nor counsel at oral argument or in their papers explained the magnitude of these "general" subsidies, i.e., whether they are *de minimis* and whether they,

accordingly, must be treated as if they were zero. *See Tr.* at 16:5-11. The *Market Economy Steel Memo* merely states that "the general subsidies found in [[                                        ]] investigations are greater than *de minimis*." If this program had no significant effect on the prices CMC paid to its supplier, then there may be no distortion and, therefore, no justification to deviate from the actual input prices.

The court is mindful of the fact that previous administrative reviews of CMC with respect to TRBs yielded zero or *de minimis* dumping margins.[17] Commerce rejected CMC's actual prices in favor of using surrogate values which are by their nature imprecise. Arguably, Commerce was faced with a difficult choice between potentially distorted actual prices and imprecise surrogate values. Choosing surrogate values resulted in above *de minimis* dumping margins for CMC which were not found when actual prices were used. The court does not question Commerce's discretion to use surrogate values when it has reason to believe that the actual prices are distorted.[18] However, the alleged distortion in the actual prices must be shown more clearly than present here. The regulation in question, 19 C.F.R. § 351.408(c)(1), evinces a preference in favor of market prices. While this preference may not rise to the level of a legal presumption, nevertheless, in order to deviate from its own regulation, Commerce must base its

---

[17] The court notes that CMC may have been entitled to revocation by virtue of no dumping for three consecutive years and such revocation may have been prevented by this change of methodology – a result with great detrimental significance.

[18] The court, however, questions whether a simple adjustment could not have corrected this potential and alleged distortion in the actual prices which may have in turn resulted in more accurate dumping margins, instead of discarding the set of actual prices in its entirety. The court also questions whether Commerce did not perform this correction on CMC's input prices because it was difficult to ascertain the exact magnitude of the distortion.

decision on a clearer and more substantial record than presented here.

The lack of any specific evidence linking either CMC's supplier or its steel input to any subsidies further undermines Commerce's justification and reasoning to use surrogate values in CMC's case. Neither this specific steel input in question, nor CMC's steel supplier was ever investigated by Commerce. There is no evidence on the record indicating that CMC's supplier benefitted from generally available subsidies, which were incidentally discovered in other investigations.[19] This insistence on specific evidence in CMC's case is consistent with the remedial, not punitive, purpose of the antidumping duty laws. *See, e.g., NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

Finally, Commerce's continuous reference to the *Market Economy Steel Memo* to support its determinations in CMC's case does not constitute a "reasoned explanation" that is required under the statute. *See, e.g., Usinor v. United States*, 26 CIT __, __, Slip Op. 02-70, 01-10 at 14 (July 19, 2002); *Altx, Inc. v. United States*, 25 CIT __, __, 167 F. Supp. 2d 1353, 1360 (2001). Under the statute, Commerce must "include in a final determination . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review . . . , concerning the establishment of dumping or a countervailable subsidy." 19 U.S.C. § 1677f(i)(3)(A). This does not mean that Commerce must "make an explicit response to every argument made by a party, but instead requires that issues material to [Commerce's] determination be discussed so that the 'path of the agency may

---

[19] The court notes that CMC's other [[ ]] supplier, [[ ]], of other steel was investigated and "the subsidies to [[ ]] were found to be *de minimis*." *Market Economy Steel Memo* .

reasonably be discerned' by a reviewing court." Statement of Administrative Action at 892, accompanying H.R. Conf. Rep. No. 103-826(I), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4215 (quoting case law). Commerce "must specifically reference in [its] determinations factors and arguments that are material and relevant or must provide a discussion or explanation in the determination that renders evident [Commerce's] treatment of a factor or argument." H.R. Conf. Rep. No. 103-826(I) at 98, *reprinted in* 1995 U.S.C.C.A.N 3773. What constitutes an explanation is an "articulat[ion of a] rational connection between the facts found and the choice made." *Queen's Flowers De Columbia v. United States*, 21 CIT 968, 978, 981 F. Supp. 617, 627 (1997) (quotation omitted). Here, Commerce attempted to establish a link between certain "not company specific" subsidies found in other investigations and CMC. However, it is not a reasonable exercise of discretion for Commerce to use a subsidy finding of a past or different investigation and apply it without inquiring further whether such a finding is applicable to the particular set of circumstances at hand. *Cf. Nation Ford Chem. Co. v. United States*, 21 CIT 1371, 1377, 985 F. Supp. 133, 138 (1997), *aff'd*, 166 F.3d 1373 (Fed. Cir. 1999) ("[S]ubsidy findings are fact-specific, and circumstances often change;" therefore, "factual findings in past determinations, while often relevant, are not binding in subsequent cases."). It is "material and relevant" that other merchandise subject to antidumping and countervailing duty orders differs from the input at issue in this case. Accordingly, Commerce must explain its decision sufficiently so that this court can reasonably discern the path of Commerce's reasoning as to why CMC's supplier must have benefitted from subsidies discovered elsewhere in the production of hot-rolled alloy steel bar sold to the PRC. The *Issues and Decision Memo* of the thirteenth administrative review simply references the *Market Economy Steel Memo* without much

elaboration.[20] *Market Economy Steel Memo* is a five page document with sparse text, reporting (mostly in tables) Commerce's (and other countries') dumping and subsidy findings about steel from the market economy country in question without further explanation. The so-called "general" subsidies at issue here are reported in a separate table tabulating various subsidies, such as investment tax credits, short-term export financing and the like, against three steel products, [[                                                                        ]].[21] Again, there is no mention of hot-rolled alloy steel bar, the steel product in question here, in the table. The numbers that appear in the table are also presented without explanation.

---

[20] The relevant portions of the *Issues and Decision Memo* state on pages 7 to 9:

> CMC . . . contend[s] that the record lacks substantial evidence that the material inputs used to produce the subject merchandise were dumped or subsidized. However, our analysis in TRBs XII[, i.e., the twelfth administrative review,] of CVD findings provides reason in the instant review to believe or suspect that certain market economy prices paid by PRC producers of TRBs for their steel inputs are subsidized. [(citing to *Market Economy Steel Memo*)]
> . . . In TRBs XII, [Commerce] conducted an exhaustive analysis of current CVD orders and found that we could reasonably infer that the particular market economy steel used by PRC TRB producers was subsidized. [(citing to *Market Economy Steel Memo*)]
> . . .
> . . . [W]e do not consider [the letter from the supplier] as credible as our Market Economy Steel Memo.
> . . . With regard to the valuation of steel inputs in the instant case, we have examined the available information and find credible, particular, and objective evidence from the Market Economy Steel Memo that supports our reason to believe or suspect that certain market economy steel purchased for use in TRBs benefitted unfairly from subsidization. . . .

[21] The court notes that one of these products is the subject of a negative finding by Commerce. *See Final Negative Countervailing Duty Determination:* [[
 ]].

Therefore, the court remands this case to Commerce to review and augment the administrative record and to explain its determinations adequately. It must demonstrate particular, specific, and objective evidence to uphold its reason to believe or suspect that the prices CMC paid the supplier for the inputs were subsidized. "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Following the language of the *House Report*, a "formal investigation" may not be necessary here; however, a presentation by Commerce to this court of substantial, specific evidence and an adequate elucidation of reasons for its determinations are essential for the court to uphold Commerce's results in the thirteenth administrative review.

## V. CONCLUSION

For all the foregoing reasons, the court holds that Commerce's determinations in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of 1999-2000 Administrative Review, Partial Rescission of Review, and Determination Not to Revoke Order in Part*, 66 Fed. Reg. 57,420 (Nov. 15, 2001), are unsupported by substantial evidence and, therefore, should be remanded to the agency for review and action consistent with this opinion.

A separate order will be entered accordingly.


Dated: _____                          _____
     New York, NY                                          Judith M. Barzilay
                                                       Judge