SLIP OP. 05-54

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____
                                          :
SHANDONG HUARONG MACHINERY                :
COMPANY,                                  :
                                          :
                    PLAINTIFF,            :
                                          :
        V.                                :     CONSOL. COURT NO. 03-00676
                                          :     PUBLIC VERSION
UNITED STATES,                            :
                                          :
                    DEFENDANT,            :
        AND                               :
                                          :
AMES TRUE TEMPER,                         :
                                          :
                    DEF.-INTERVENOR.      :
_____ :

[Commerce's Final Determination on heavy forged hand tools sustained in part and remanded in part]


                                          Dated: May 2, 2005


        *Hume & Associates, PC* (*Robert T. Hume*), for plaintiff Shandong Huarong Machinery Company.

        *Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*), for defendant United States.

        *Wiley Rein & Fielding LLP* (*Timothy C. Brightbill, Eileen P. Bradner*, and *M. William Schisa*), for defendant-intervenor Ames True Temper.

OPINION AND ORDER

EATON, *Judge*: This consolidated action is before the court on Rule 56.2 motions for judgment upon the agency record filed by plaintiffs Shandong Huarong Machinery Company ("Huarong") and Ames True Temper ("Ames").[1]  By their motions, the parties contest certain aspects of the United States Department of Commerce's ("Commerce") final results of the antidumping duty administrative review of heavy forged hand tools from the People's Republic of China ("P.R.C.") for the period of review from February 1, 2001, to January 31, 2002 (the "POR").  *See* Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the P.R.C., 68 Fed. Reg. 53,347 (ITA Sept. 10, 2003) (final results) ("Final Results").[2]  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the following reasons this matter is sustained in part and remanded in part.

STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. . . ." 19 U.S.C. § 1516a(b)(1)(B)(I).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305

---

[1]      As plaintiff, Ames has filed its own motion for judgment upon the agency record, challenging certain aspects of Commerce's final results which differ from those raised by Huarong.  As defendant-intervenor, Ames has also filed a response in opposition to Huarong's motion for judgment upon the agency record.

[2]      This is the eleventh administrative review of the final antidumping duty order in this case.

U.S. 197, 229 (1938)).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Id*. (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."  *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Abbott v. Donovan*, 6 CIT 92, 97, 570 F. Supp. 41, 47 (1983)).

DISCUSSION

I.      Huarong's Motion

        A.      Huarong's Scrap Offset

In constructing normal value in a nonmarket economy ("NME")[3] context, Commerce allows for an offset[4] for the scrap steel generated during production of the subject merchandise.

---

[3]      A "nonmarket economy" country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority."  19 U.S.C. § 1677(18)(C)(I).

[4]      In its calculation of normal value, Commerce reduces, or offsets, a manufacturer's costs by the sales value of any scrap that is generated during the production process.  Normal value is "the price at which the subject merchandise is first sold . . . for consumption in the

(continued...)

In order to obtain this offset, in its two previous reviews[5] Huarong reported its scrap sales based on the difference between the input weight of the steel and the finished weight of the merchandise. *See* Mem. Supp. Pl.'s Mot. for J. Agency R. ("Pl.s' Mem.") at 16. It did not correlate the production or sale of scrap to the POR, noting in a later response that "it is impossible to correlate specific scrap with specific periods of production." Pl.'s Mem. at 18. Commerce granted the offset in both reviews. In the eleventh administrative review at issue here, Huarong again reported that the "amount of scrap is calculated by taking the difference between [the] sheared piece used for forging and the finished weight of the item." Pl.'s Mem. at 14 (internal citation omitted). Several months later, Commerce issued a supplemental questionnaire, in which it asked Huarong to determine "[w]hat percentage of steel scrap is sold and what percentage is used to produce hand tools and other non-subject merchandise[.]" Pl.'s Mem. at 15 (citation omitted in original). In its response, Huarong stated that it

---

[4](...continued)
exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price. . . ." 19 U.S.C. § 1677b(a)(1)(B)(I). When the subject merchandise is exported from a nonmarket economy country, however, normal value is generally determined by valuing the factors of producing the merchandise in a surrogate country or countries. 19 U.S.C. § 1677b(c)(1).

To the extent possible, Commerce is directed to select as surrogates market economy countries that (1) are at a level of economic development comparable to that of the NME country; and (2) are significant producers of comparable merchandise. 19 U.S.C. § 1677b(c)(4). Commerce is also directed to use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1).

[5]        *See* Heavy Forged Hand Tools From the P.R.C., 66 Fed. Reg. 48,026 (ITA Sept. 17, 2001) (final results); Heavy Forged Hand Tools From the P.R.C., 67 Fed. Reg. 57,789 (ITA Sept. 12, 2002) (final results).

> sold 100% of the scrap steel generated from the production of the subject merchandise. No scrap generated from the production of the subject merchandise was used internally . . . or to produce hand tools or other non-subject merchandise. The amount of scrap reported in the FOP [factors of production] chart is based on the difference between the input weight and the weight of the finished product.

Pl.'s Mem. at 15 (internal citation omitted).

Thereafter, Commerce issued a second supplemental questionnaire in which, for the first time, it asked Huarong to "report a revised per-unit scrap offset which equals the total quantity of scrap from the production of subject bars sold during the POR." Pl.'s Mem. at 16 (internal citation omitted). In other words, Commerce wanted to know how much scrap attributable to the subject merchandise was actually sold during the POR. Commerce gave Huarong one week to respond, which fell over the Chinese New Year holiday. Huarong asked Commerce for a one-week extension of the deadline to February 7, 2003, but was instead given an extension of time until February 4, 2003. The amount of time that Huarong had to respond, including the extension of time, was thirteen days. *Id*. at 13. Huarong did not respond until February 13, but Commerce nevertheless accepted the untimely submission, which did not correlate sales to production. Based "on the merits of the record evidence," Commerce ultimately denied Huarong's request for a scrap offset. Issues and Decision Memorandum for the Final Results, Pl.'s Ex. 2 ("Issues and Decision Mem.") at 27.

Huarong argues that it "does not separate scrap according to subject and non-subject merchandise. The scrap from all of Huarong's production [is] collected and sold together. In addition, scrap sales are not made on a regular basis. So it is impossible to correlate specific

scrap with specific periods of production." Pl.'s Mem. at 17–18. Thus, Huarong's primary contention is that it "cannot provide records it does not have." *Id*. at 19. Huarong nevertheless maintains that it was not given a sufficient amount of time in which to respond to Commerce's second supplemental questionnaire. Thus, Huarong asks the court to either instruct Commerce to use its scrap figure as reported, or to "remand the case to Commerce and order that Commerce reopen the record." *Id*. at 22.

In its Issues and Decision Memorandum, Commerce explained that its "normal practice with respect to granting an offset for scrap is to provide the offset only with regard to the quantity of scrap actually sold during the POR, rather than the entire production amount." Issues and Decision Mem. at 28. Commerce further claims that "this case is not about Huarong's record keeping of the amount of scrap sold per piece of subject merchandise. Rather, the issue here is Huarong's failure to provide the relative amounts of subject and non-subject merchandise, over which Commerce could allocate the scrap sold." Def.'s Resp. in Opp'n to Pls.' Mots. J. Agency R. ("Def.'s Resp.") at 13. That is to say, Commerce contends that Huarong must provide the percentage of the scrap resulting solely from production of the subject merchandise. This percentage would then be used to calculate the value of scrap actually sold during the POR.

Commerce has broad discretion to discard one methodology in favor of another in order to calculate more accurate dumping margins. *See Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1169, 178 F. Supp. 2d 1305, 1327 (2001). This discretion, however, is subject to two limitations. First, "Commerce may not make minor but disruptive changes in

methodology where a respondent demonstrates its specific reliance on the old methodology used

in multiple preceding reviews"; second, "in every instance where an agency changes its tack, it

must provide a reasoned explanation for doing so." *Id*; *see also Cinsa, S.A. de C.V. v. United

States*, 21 CIT 341, 349, 966 F. Supp. 1230, 1238 (1997). Here, Huarong does not dispute that

Commerce was reasonable in changing its methodology in order to calculate dumping margins

more accurately, nor does Huarong provide any evidence that it specifically relied on

Commerce's old methodology. Huarong states only that it "set its prices after calculating, *inter

alia*, the offset that it would receive from its sales of scrap." Pl.'s Mem. at 21. Moreover,

Commerce has provided a reasonable explanation for changing its methodology. *See* Def.'s

Resp. at 12 (explaining that Commerce's "normal practice with respect to granting an offset for

scrap is to provide the offset only with regard to the quantity of scrap actually sold during the

POR, rather than the entire production amount."). Because Huarong does not dispute the

reasonableness of the change in methodology, and makes no argument that it relied on the old

methodology, the court finds Commerce's change in methodology to be in accordance with law.

With respect to the amount of time that Commerce gave Huarong to respond to its

supplemental questionnaire, Commerce generally grants a party ten days in which to respond to

such an inquiry. *See* Imp. Admin. Antidumping Manual, Ch. 4 at 18 (*available at*

http://www.ia.ita.doc.gov/ (last visited Apr. 20, 2005)). Commerce makes no standard provision

for an increase in the time allotted when a supplemental questionnaire is issued pursuant to a

change in Commerce's methodology. Thus, rather than simply requiring Huarong to provide

additional routine information, here the change in methodology required it to provide the relative

amounts of subject and non-subject merchandise from which scrap was generated, a figure Huarong does not normally record. Although Huarong notes that it would "not [be] easy" for it to apply Commerce's new methodology, it does acknowledge that, with a sufficient amount of time, it could supply the data necessary to satisfy Commerce's new scrap offset methodology. *See* Pl.'s Mem. at 23. This Court has repeatedly held that a party must be given a reasonable opportunity to respond to Commerce's requests. *See, e.g., United States v. Stanley Works*, 17 CIT 1378, 1382, 849 F. Supp. 46, 50 (1993) (dismissing action for failure to "provide [the defendant] with a reasonable opportunity to be heard" where Commerce allowed only "a truncated response period"); *United States v. Chow*, 17 CIT 1372, 1376, 841 F. Supp. 1286, 1289–90 (1993) (holding that court must provide litigant with "fair opportunity to be heard"). Thus, on remand, the court directs Commerce to reopen the record in order to afford Huarong a reasonable opportunity to respond to its second supplemental questionnaire.

### B.     The "*Sigma*" Cap

In investigating imports from NME countries, Commerce is directed, under certain circumstances, to value the factors of production based on surrogate data from an appropriate market economy country or countries. *See* 19 U.S.C. § 1677b(c)(1). In *Sigma Corp. v. United States*, 117 F. 3d 1401 (Fed. Cir. 1997), the court found that, when calculating constructed value where the cost of an imported input is presumed to be the same as its domestic counterpart, a rational manufacturer will minimize its material and freight costs by "purchasing imported [product] if the cost of transportation from the port to the foundry [is] less than the cost of transportation from the domestic . . . mill to the foundry." *Id*. at 1408. Put another way, where

the cost of the imported and domestic product are presumed to be the same, the manufacturer is further presumed to acquire the product from the nearest source in order to minimize freight costs. Thus, according to Huarong, when Commerce uses surrogate import figures, it must cap the inland freight expenses associated with transporting a factor of production to the subject merchandise producer in China at the distance that producer is from the nearest port. Pl.'s Mem. at 25.

Here, Commerce, seeking to comply with *Sigma*, used the distances that Huarong's steel suppliers were from Huarong to calculate a weighted average distance. Since the resulting weighted average was greater than the distance from Huarong to the nearest port, Commerce applied a cap equal to that distance[6] for the inland freight cost. Huarong argues that rather than capping the weighted average distance, "Commerce should have capped the individual steel supplier distances . . . . Using this approach, the weighted average steel inland freight distance would have been . . . less than 58 percent of the distance Commerce used." Pl.'s Mem. at 26 (citation omitted). Thus, Huarong maintains that "[w]hat is true for an overall calculation should be true for sub-calculations . . . ." *Id*. at 28.

Commerce challenges Huarong's argument that the *Sigma* "cap" should be applied to sub-calculations, stating that "the <u>Sigma</u> court simply determined that adding a constructive freight factor to the surrogate market's import price that exceeded freight from the nearest port was impermissible. The choice of methodology to address this concern remained with

---

[6]     The distance in question is 300 kilometers.

[Commerce] . . . ." Def.'s Resp. at 17.

Commerce is correct that the court in *Sigma* did not direct the use of a specific methodology. Recognizing the difficulty, in a non-market economy case, of selecting a methodology that produces reasonably accurate estimates of the true value of the factors of production, as the statute directs, the *Sigma* court stated: "[W]e do not dictate the particular methodology that Commerce must use to determine the freight component in this case, but leave that decision to the discretion of Commerce." *Sigma*, 117 F. 3d at 1408. Nonetheless, Commerce must satisfy the overriding statutory injunction to "determine [antidumping duty] margins as accurately as possible." *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994). In complying with this injunction Commerce is obliged to adequately explain how its chosen methodology achieves the required result. *See NTN Bearing Corp. of America v. United States*, 14 CIT 623, 634, 747 F. Supp. 726, 736 (1990) (affirming agency's choice of methodology where the agency provided "clear, reasonable explanations for the methodology to be implemented."); *see also RHP Bearings Ltd. v. United States*, 28 CIT __, __, slip op. 03-10 at 2 (Jan. 28, 2003) (not reported in the Federal Supplement) (ordering Commerce in prior remand "to explain its methodology . . . and explain why the methodology comported with statutory requirements."). This is true generally, and particularly where the Federal Circuit has provided guidance. Here, Commerce has failed to supply an adequate explanation as to why its methodology satisfies the reasoning found in *Lasko* and *Sigma*. On remand, Commerce must explain why, in calculating its weighted average, it should include any distance greater than the distance from the nearest port or, failing that, adjust its methodology appropriately.

C.      Commerce's Use of Forging Quality Steel Billet

To value the steel Huarong used to produce the subject merchandise, Commerce used two

Indian surrogate import categories.  The first included "forging quality" steel billet and the

second included "other," or ordinary, steel billet.  Huarong argues that "the record evidence

shows only that Huarong used 'ordinary steel billet to produce the subject merchandise.'"  Pl.'s

Mem. at 29 (internal citation omitted).  Huarong states:

> All record evidence indicates that the steel input used in production
> of subject merchandise was ordinary steel billet.  The record also
> shows that Huarong used the steel for purposes other than forging,
> such as [for] use in a rolling mill.  In response to Commerce's
> questionnaire, Huarong stated that [it] used "ordinary steel billet to
> produce the subject merchandise."

Pl.'s Mem. at 32 (internal citation omitted).  The "record evidence" Huarong refers to consists of

its unverified responses to Commerce's questionnaires in this review, as well as its verified

responses to its last review, for 2000-2001.  In that review,

> [t]he steel supplier stated that the steel supplied to Huarong is . . .
> semi-finished and can be used for other purposes (e.g., used by a
> rolling mill to reshape into a round, square, or flat shape), and []
> the steel has a rough surface and uneven grain.  This same supplier
> provided steel to Huarong during this POR and the fact [that] the
> billet can be used for "other purposes" means non-forging
> purposes.

Id. at 31 (internal quotation omitted) (emphasis in original).

Commerce maintains that the record for the previous review is insufficient for it to

conclude that Huarong did not use forging quality steel billet.  Commerce explains: "'[F]orging

quality steel billet' provided the appropriate surrogate value in this case because Huarong did not

submit any information for inclusion in the record concerning the quality of the steel billet used

to manufacture forged hand tools." Def.'s Resp. at 18 (internal citations omitted). Commerce further notes that Huarong's unverified responses in this review do not suffice to establish the quality of the steel billet used to produce the forged hand tools. *Id*. at 19 ("Huarong provided no information concerning the quality of the steel billet used during this period of review and, thus, failed to meet its 'burden of creating an adequate record.'") (internal citation omitted).

The court finds Commerce's argument persuasive. At the outset, Huarong's reliance on Commerce's determination in the 2000-2001 administrative review is misplaced for two reasons. First, that determination found only that Huarong used steel billet rather than bars; it did not address the quality of the billet. *See* Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the P.R.C., 64 Fed. Reg. 43,659, 43,669 (ITA Aug. 11, 1999) (prelim. results). The statement of Huarong's supplier in the previous review indicating that the steel could be used for other purposes simply does not establish its quality. Second, as Commerce points out, "each administrative review is a separate segment of proceedings with its own unique facts. Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews." Def.'s Resp. at 14.

The court also finds that Huarong's unverified responses in this review do not provide sufficient evidence as to the quality of billet used to produce the subject merchandise. In determining the facts for a particular review, Commerce is entitled to use the best available information. Here, save for its unverified questionnaire responses, Huarong submitted no evidence concerning the quality of the steel billet used during the POR. It is well established that

"the burden of creating an adequate record lies with respondents and not with Commerce."

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 936, 806 F. Supp. 1008, 1015

(1992). Thus, Commerce was entitled to rely on the best available information—and the

reasonable inference that, absent probative evidence to the contrary, Huarong would use forging

quality steel to make forged hand tools. *See Hebei Metals & Minerals Imp. & Exp. Corp. v.*

*United States*, 28 CIT __, __, slip op. 04-88 at 28 (July 19, 2004) (citing *Yantai Oriental Juice*

*Co. v. United States*, 26 CIT 605, 607 (2003) (not reported in the Federal Supplement)

("Commerce's general mandate . . . to calculate normal value as accurately as possible on the

basis of the best available information . . . . allows Commerce to draw reasonable inferences

from the record . . . ."). Commerce's finding is therefore affirmed.


　　　　D.　　　Commerce's Use of the Brokerage and Handling Surrogate

　　　　Next, Huarong argues that Commerce erroneously used the 1997 Indian surrogate value

figure for brokerage and handling found in Stainless Steel Wire Rod From India, 63 Fed. Reg.

48,184 (ITA Sept. 9, 1998) (final results) ("Stainless Steel Wire Rod"), even though another

more contemporaneous figure was available. *See* Certain Hot-Rolled Carbon Steel Flat Products

From India, 66 Fed. Reg. 50,406 (ITA Oct. 3, 2001) (final determination) ("Hot-Rolled Steel Flat

Products"). Huarong bolsters its argument by pointing out that Commerce used the Hot-Rolled

Steel Flat Products value in another determination, Certain Ball Bearings and Parts Thereof From

the P.R.C., 68 Fed. Reg. 10,685 (ITA Mar. 6, 2003) (final determination) ("Ball Bearings"),

which was decided contemporaneously with this hand tools review. Pl.'s Mem. at 33. Thus,

Huarong maintains that Commerce should have applied the Hot-Rolled Steel Flat Products value

to this determination as well.

In rejecting the Hot-Rolled Steel Flat Products figure, Commerce has stated that it "prefers to select values that are: 1) for products as similar as possible to the input being valued, 2) contemporaneous with, or closest in time to the POR, and 3) representative of a range of prices in effect during the POR." Issues and Decision Mem. for Potassium Permanganate From the P.R.C., 66 Fed. Reg. 46,775 (ITA Sept. 7, 2001) (final results) ("Potassium Permanganate") at Comment 16. In providing the reasons for its choice of surrogate value in this case, however, Commerce indicated that it relied on only one of these stated reasons and one previously unstated reason. First, Commerce found "that stainless steel wire rod is a product more similar to bars and wedges due to the fact that both products are small in diameter." Issues and Dec. Mem. at 13. Second, Commerce noted that the merchandise in Stainless Steel Wire Rod was containerized (as were the bars and wedges produced by Huarong), while the merchandise in Hot-Rolled Steel Flat Products was not. *Id*.

Thus, Huarong maintains that Commerce has not satisfied its own criteria, set forth in Potassium Permanganate, "since only one of the three criteria support Commerce's position and that one – the similarity of products – becomes irrelevant." Pl.'s Mem. at 35. Huarong states:

> First, Commerce used the *Hot Rolled Steel Flat Products* surrogate value for *Ball Bearings*, and the *Ball Bearings* period of investigation (July 1, 2001 to December 31, 2001) was contemporaneous with Huarong's hand tools review. Second, a comparison of *Hot Rolled Steel Flat Products* and *Stainless Steel Wire Rod* . . . is secondary since ball bearings are packed in cartons and containerized just like Huarong's bars. Commerce should have rejected the *Stainless Steel Wire Rod* . . . surrogate value for

> *Ball Bearings* on the size and container grounds, or applied it [to]
> Huarong. Third, . . . Commerce has a duty to determine margins as
> accurately as possible, and to use the best available information in
> doing so. The rationale for using the best available information is
> to obtain the most accurate dumping margin possible. If containers
> are the issue, the similarity of the "input" is irrelevant.

*Id*. (internal citations omitted).


Commerce maintains that it acted reasonably in deciding that the type of merchandise,

and the manner in which it is shipped, yields a more accurate brokerage and handling surrogate

value than contemporaneity of the shipping to the POR alone. Commerce states, "Huarong urges

the Court to . . . conclude that contemporaneous brokerage and handling expenses for a product

that is shipped in a different manner than the subject merchandise must be more accurate than

non-contemporaneous brokerage and handling costs for merchandise that is shipped and handled

in the same manner as heavy forged hand tools." Def.'s Resp. at 20. As Commerce explained in

its Issues and Decision Memorandum:

> [W]e find that stainless steel wire rod is a product more similar to
> bars and wedges due to the fact that both products are small in
> diameter. Hot-rolled steel flat products, on the other hand, have
> little in common with bars and wedges, other than that they are
> both made of steel. . . . While stainless steel wire rod is also coiled
> [for shipping purposes], the wire rod coils are smaller than the
> large coils used in hot-rolled flat products and are packed in a
> manner more similar to bars and wedges. Specifically, the subject
> merchandise in Hot-Rolled Steel Flat Products from India was not
> containerized cargo. The subject merchandise in Stainless Steel
> Wire Rod from India was containerized cargo. Huarong's bars and
> wedges are shipped in containers. For these reasons, we find that
> the brokerage and handling surrogate value from Stainless Steel
> Wire Rod from India is the best available information.

Issues and Decision Mem. at 13. With respect to Huarong's argument that Commerce apply the

Hot-Rolled Steel Flat Products value to this determination, as it did in Ball Bearings, Commerce

states:

> Commerce's analysis in the Ball Bearings determination is
> consistent with this case.  In Ball Bearings, Commerce did not
> compare the two datasets that are upon the record of this case and
> conclude that contemporaneousness outweighed the means of
> transport.  Rather, Commerce compared the Carbon Steel Flat
> Products rate with a rate determined in a different investigation.
> Further, the Ball Bearings decision does not establish whether
> either of the surrogate values considered by Commerce involved
> brokerage and handling of containerized merchandise.  Indeed, the
> most that can be inferred from Ball Bearings is that Commerce
> preferred the more contemporaneous brokerage and handling factor
> in a case where containerization was not at issue.

Def.'s Resp. at 22–23.


       Nothing in Potassium Permanganate requires Commerce to choose surrogate values that

meet all three of the criteria set forth.  Rather, the criteria indicate a preference for the best, most

accurate information available.  In this respect, Commerce has broad discretion in selecting the

most appropriate surrogate values.  *See China Nat. Mach Imp & Exp. Corp. v. United States*, 27

CIT __, __, 264 F. Supp. 2d 1229, 1238 n.14 (2003) ("'Commerce does not need to prove that its

methodology was the only way, or even the best way to calculate surrogate values for' subject

merchandise.  Such choices will be upheld as long as they are reasonable.") (internal quotation

omitted).  Based on the foregoing, the court finds reasonable Commerce's determination that the

type of merchandise being shipped, and the method by which it is shipped, provide a more

accurate surrogate value than a more contemporaneous value for a dissimilar product that is not

containerized.

E.       Commerce's Subsidy Suspicion Policy

Finally, Huarong maintains that Commerce did not act in accordance with its subsidy

suspicion policy.  Huarong explains:

> Commerce should have excluded any prices which may be
> subsidized, consistent with the legislative history to the 1988
> amendments to the antidumping statute and its practice in other
> PRC antidumping cases.  As such, it must exclude not only data
> from the three (3) countries noted in its preliminary surrogate
> values memo [Korea, Thailand, and Indonesia], but nearly every
> other country, because . . . most countries have generally available
> subsidies.  Since the WTO has determined that the U.S. Foreign
> Sales Corporation ("FSC") tax scheme is a WTO-illegal subsidy
> and the United States has agreed to implement the WTO's ruling,
> the United States must be deemed to have export subsidies, too.
> As such, any U.S. data must also be excluded from surrogate value
> calculations.

Pl.'s Mem. at 37.

The legislative history to which Huarong refers pertains to 19 U.S.C. § 1677b(c)(4),[7]

which instructs Commerce on the use of prices or costs of factors of production in market

---

[7]      This statute states:

> The administering authority, in valuing factors of production under
> paragraph (1) [i.e., with respect to surrogate values], shall utilize, to the
> extent possible, the prices or costs of factors of production in one or more
> market economy countries that are—
>
> (A) at a level of economic development comparable to that
> of the nonmarket economy country, and
>
> (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4).

economy countries, or surrogates, to value factors of production in NME countries.  The

legislative history for the statute states:

> In valuing such factors, Commerce shall avoid using any prices
> which it has reason to believe or suspect may be dumped or
> subsidized prices.  However, the conferees do not intend for
> Commerce to conduct a formal investigation to ensure that such
> prices are not dumped or subsidized, but rather intend that
> Commerce base its decision on information generally available to
> it at that time.

Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep. No. 100-576, at

590–91(1988), *reprinted in* 1988 U.S.C.C.A.N. 1623–23.  Commerce relied on this legislative

history to construct its NME subsidization methodology.  *See Fuyao Glass Indus. Group Co. v.*

*United States*, 29 CIT __, __, slip op. 05-6 at 5 n.3 (Jan. 25, 2005).  Commerce argues that, while

it is clear that Congress intended that Commerce should disregard prices distorted by subsidies,

the legislative history also indicates that Congress did not intend that Commerce should conduct

a formal investigation regarding subsidization.  *Id*.  Commerce states:

> [W]ith respect to United States export prices, Commerce
> "decline[d] to take into account adjustments which are
> insignificant in relation to the price or value of the merchandise."
> An "insignificant adjustment" is "any individual adjustment having
> an ad valorem effect of less than 0.33 percent, or any group of
> adjustments having an ad valorem effect of less than 1.0 percent."
> 19 C.F.R. § 351.413.  [This section] gives [Commerce] the
> flexibility to determine, on a case-by-case basis, whether it should
> disregard a particular insignificant adjustment."  Commerce
> explained in the Decision Memorandum that it would not exclude
> United States export prices because exclusion would result in an
> insignificant adjustment.  Specifically, Commerce determined that
> the ad valorem percentage effect in this case was only 0.07 percent.
> Therefore, Commerce's decision not to exclude United States
> export prices because exclusion would result in an insignificant ad
> valorem difference in normal value is supported by substantial
> evidence and otherwise in accordance with law.

Def.'s Resp. at 26 (internal citations omitted).

Here, the information generally available to Commerce indicates that the level of subsidies in the United States, 0.07%, would result in an "insignificant adjustment," which Commerce may disregard. *See* 19 U.S.C. § 1677f-1(a)(2) (Commerce may "decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise" when determining normal value). It is worth noting that this Court has found that, while the legislative history cited by Commerce in constructing its NME methodology provides for the avoidance of prices the agency has reason to believe or suspect *may* be subsidized, Commerce's actual methodology requires it to avoid prices it has reason to believe or suspect *are* subsidized. *Fuyao Glass*, 29 CIT at __, slip op. 05-6 at 6–7. When the magnitude of the subsidy and the application of this standard are combined with the caveat that, in making its determination, Commerce is not required to conduct an investigation, it would appear that Commerce need not avoid the prices of which Huarong complains. This result, however, would seem to be at odds with the result in *Fuyao*, where Commerce chose not to disregard subsidies that were *de minimis*. In that case, Commerce stated, "What is relevant to [Commerce's] determination of whether it has a reason to believe or suspect that prices may be subsidized, is the existence of a subsidy program. A subsidy is, in itself, a market distortion." Final Results of Redetermination Pursuant to Court Remand, *Fuyao Glass Indus. Group Co. v. United States*, 27 CIT __, slip op. 03-169 (Dec. 18, 2003) (not reported in the Federal Supplement) at 37–38. Thus, the court finds that, on remand, Commerce must more fully explain its decision to disregard the effect of subsidies from the United States and other countries.

II.     Ames' Motion

        A.      Valuation of Steel Used to Produce Pallets

        As plaintiff, Ames has filed its own motion for judgment upon the agency record,

challenging certain aspects of Commerce's final results.  As a domestic producer, Ames raises

issues that differ from those raised by Huarong.  Ames first challenges Commerce's decision to

use Indian imports of steel scrap as the surrogate value for the steel Huarong used to produce

steel pallets.  *See* Ames' Mem. Supp. Mot. J. Agency R. ("Ames' Mem.") at 7.  Huarong uses the

pallets to ship the subject merchandise.  Ames contends that an invoice Huarong supplied to

Commerce to support its claim that it used scrap steel does not provide enough information to

sustain Commerce's finding.[8]  Ames argues that "the purchase invoice states that the material

purchase is, in fact, . . . not scrap iron or steel."  *Id*. at 7.  In addition, Ames claims that the price

paid for the steel does not support the conclusion that it was scrap.[9]

---

        [8]     Based on the invoice, Commerce selected as the surrogate an Indian producer of
steel that was classified as "scrap" by the Customs Service upon importation to the United States.
Ames notes, however, that the invoice itself "makes *no* mention whatsoever concerning the grade
of steel purchased.  Nor does the invoice make a single reference to the word scrap."  Ames'
Mem. at 7 (emphasis in original).

        [9]     Ames maintains that the unit price Huarong paid for the steel in question was
"significantly higher than the market price for scrap steel during the period of review, and is in
fact much closer to the price range for finished flat-rolled steel products . . . ."  Ames' Mem. at
7–8.

Ames further argues that

                 while Commerce's conclusion is one possible inference, it can
                 equally be inferred from this evidence that: (1) the supplier is
                 supplying spring steel stock from its inventory; (2) Huarong
                 contracted the supplier to cut spring steel to its specifications; or
                 (3) Huarong is sourcing its steel from this supplier in order to

                                                                                      (continued...)

Commerce maintains that the invoice submitted by Huarong shows that Huarong

purchased the steel used to the make the pallets from an auto-parts company that manufactures

steel flat springs, "thus indicating that the steel used to make the pallets was a by-product of steel

flat spring manufacture." Issues and Decision Mem. at 14. As a result, Commerce rejects Ames'

argument that it "should infer that Huarong purchased higher priced product from its auto-parts

manufacturing company supplier, as opposed to lower priced scrap steel." Def.'s Resp. at 28. In

addition, Commerce notes that it "found Huarong's assertion that it used scrap steel to be

credible, based upon Huarong's own statement . . . ." *Id*. In other words, Commerce believes

that it has sufficient evidence from which to draw the inference that the steel Huarong purchased

from the auto-parts company was scrap. Thus, Commerce argues that its inference, not Ames',

controls. Finally, Commerce found the prices provided in Ames' brief to be unreliable,

explaining that "this Court recently noted a wide geographic variance in scrap prices and rejected

similar United States scrap prices as unrepresentative." Def.'s Resp. at 29 (citing *Anshan Iron &*

*Steel Co. v. United States*, 28 CIT __, __, slip op. 03-83 at 23–24 (Mar. 15, 2003)).


In valuing factors of production, Commerce's may draw reasonable inferences from the

record. *Hebei,* 28 CIT at __, slip op. 04-88 at 28. The court's role is to determine, based on the

evidence available, whether Commerce's inference therefrom was reasonable. *Bratsk Aluminum*

---

[9](...continued)
> lower its . . . costs by utilizing the supplier's purchasing power for
> spring steel stock.

Ames' Mem. at 8.

*Smelter v. United States*, 28 CIT __, __, slip op. 04-75 at 13 (June 22, 2004) (not reported in the

Federal Supplement). Although Commerce's inference here is not the only possible one, the

court nevertheless finds that Commerce's inference is reasonable, as it is supported by the

information contained in Huarong's invoice concerning the supplier and Huarong's statements on

the record.


　　　　B.　　　Labor Costs for Steel Pallet Production

Ames next argues that Commerce's valuation of the steel used to produce the pallets

failed to take into account the labor costs associated with fabricating the pallets. Ames maintains

that

> pallets do not magically spring into being out of steel strips – other
> costs are involved. It is clear that a surrogate value for pallets that
> accounts for all inputs used in their production is more accurate,
> and thus more likely to lead to an accurate dumping margin, than a
> value that only accounts for the cost of one input.

Ames' Mem. at 10.


Commerce maintains that these labor costs are accounted for under brokerage and

handling, and that "Ames identifies no record information supporting its claim that the cost of

pallet assembly is not incorporated in the brokerage and handling expense utilized by Commerce

in this segment of proceedings." Def.'s Resp. at 30. Commerce explains:

> Based upon this record, Commerce "found nothing to indicate
> whether the miscellaneous handling expenses [i.e., the labor costs
> associated with manufacturing the pallets] cited by the petitioner
> are or are not covered by this surrogate value [submitted by
> petitioner]. In the absence of clear evidence, [Commerce] must
> rely upon its judgment regarding how such expenses are normally

paid."

Def.'s Resp. at 31 (quoting Issues and Decision Mem. at 21). In its Issues and Decision Memorandum, Commerce states that, in its experience, "the freight forwarder typically pays all of the miscellaneous expenses necessary to export a product, and then bills its customer (typically, the exporter) for these costs. Absent evidence to the contrary, it is reasonable to assume that the brokerage and handling surrogate value captures these costs." Issues and Decision Mem. at 22.

Although the court agrees that Commerce need not undergo an item-by-item analysis in calculating factors of production, *see Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999), Commerce's calculations must nevertheless be supported by substantial evidence. *Huaiyin*, 322 F.3d at 1374. While Commerce may make reasonable inferences, it may only do so when the evidence indicates its conclusion. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 167 (1962) ("There are no findings and no analysis here to justify the choice made, no indication of the basis on which [the agency] exercised its expert discretion."). Thus, it is not sufficient for Commerce to simply rely on the absence of evidence to reach its decision; rather, Commerce must provide findings and analysis justifying its determination. Because Commerce relies solely on its judgment in determining that the labor used to produce pallets is part of the miscellaneous expenses necessary to export a product, the court finds that Commerce must supply more information and a more complete explanation to support its decision to include these costs under brokerage and handling.

C.      Costs Associated with Agency Sales

Ames argues that Commerce should have deducted certain costs associated with agency sales[10] from Huarong's United States price. In its brief at the administrative level in this case, Ames argued that because Commerce's surrogate value for brokerage and handling did not account for these costs, "a further adjustment was required to accurately capture all brokerage and handling expenses associated with these sales." Ames' Mem. at 11.

Commerce begins its argument by explaining how it treats selling expenses in NME cases:

> The antidumping statute permits Commerce to make certain adjustments to the [U.S.] price of subject merchandise to account for differences in the circumstances-of-sale between the United States market and the foreign market. Permitted adjustments include adjustment for the difference in direct selling expenses incurred in the United States and foreign market. Direct expenses are expenses "that result from, and bear a direct relationship to, the particular sale in question."
>
> However, in nonmarket economy cases, the normal value statute does not address direct selling expenses. As a result, Commerce cannot determine the difference in the commissions of United States and home market sales. . . . Indeed, the purpose of having a separate nonmarket economy statute is that home market prices in nonmarket economies are inherently unreliable and, thus, the statute does not support the lopsided adjustment proposed by Ames.

Def.'s Resp. at 33–34 (internal citations omitted). Ames apparently takes no issue with Commerce's practice; rather, it disputes the characterization of these particular charges as commissions. For its part, Commerce maintains that "Ames merely argue[s] that the agent in

---

[10]     The costs associated with agency sales are commonly known as "agency fees."

this case facilitated the United States sales of subject merchandise and earned a percentage of each individual sale as compensation. Commerce's determination that these transactions are commissions is clearly reasonable." *Id*. at 34. Having decided to treat these transactions as commissions, Commerce states that it "does not make circumstance-of-sale[] adjustments in NME cases for differences in commissions." Issues and Decision Mem. at 21.

Ames agrees that Commerce need not make adjustments for direct selling expenses. Rather, "[t]he crux of Ames' argument is that the 'agency fees' paid by Huarong were actually additional brokerage and handling expenses, not 'commissions.' Brokerage and handling expenses are a type of movement expense that Commerce does deduct from U.S. price in NME cases." Ames' Mem. at 11 (emphasis omitted). In other words, Ames argues that Commerce should treat the expenses as brokerage and handling expenses, for which Commerce must make an adjustment. If the expenses are instead treated as commissions, as Commerce found, then no adjustment is warranted.

The court agrees with Commerce that, where an agent earns a percentage of each United States sale, such "agency sales" are reasonably classified as "commissions." Ames has presented nothing to suggest otherwise and so it is reasonable for Commerce to conclude that they are just what they appear to be and that no adjustment need be made.

D.      Huarong's Handling Expenses

Ames argues that Commerce failed to account for certain of Huarong's handling expenses by erroneously "assum[ing] that brokerage and handling surrogate value[s] capture[] these costs." Ames' Mem. at 13 (quoting Issues and Decision Mem. at 22). Ames states:

> The port charge surrogate calculated by Commerce is incomplete. . . . [It] covers only the movement of the container from the container yard to the ship. Huarong's mode of transportation for its inland freight is by truck. Therefore, Commerce failed to account for the movement of the merchandise from the truck to the container yard.

*Id* (internal citations omitted). Ames also contends that

> For certain U.S. sales, Huarong claimed that it did not incur brokerage and handling expenses even though the terms of delivery were "free on board" (FOB). FOB is a standardized international commercial term (INCOTERM) that means that the seller is responsible for the costs of transportation and handling the merchandise until the "goods pass the ship's rail." For FOB sales, the responsibility for brokerage, wharfage, stevedorage, and the lashing and containerization of pallets is borne by the seller – in this case, Huarong. Huarong's claim that it did not incur these expenses on its FOB sales is inconsistent with the plain meaning of the term and, in the absence of any supporting documentation, is simply not credible.

*Id*. at 14–15.

With respect to the movement of Huarong's merchandise from the truck to the container yard, Commerce again relies on the determination in Steel Wire Rod for its position that the brokerage and handling surrogate captured expenses related to containerization. Commerce "also noted the absence of record evidence that Huarong incurred any demurrage and storage charges." Def.'s Resp. at 36. In other words, if Huarong did not incur separate expenses for demurrage and storage, Commerce argues, it would be reasonable to assume that such expenses were already included in the value for brokerage and handling. Commerce explains that it

examined source documents from the <u>Steel Wire Rod</u> determination in an effort to determine whether these expenses fell outside the scope of the Indian exporter's reported brokerage and handling expense. However, as with the [labor costs associated with the] assembly of pallets, the source documentation did not break down brokerage and handling expenses to resolve this factor at the level of the miscellaneous expenses listed by Ames. Commerce thus concluded, based upon its experience in administering the antidumping law, that "the freight forwarder typically pays all of the miscellaneous expenses necessary to export a product, and then bills its customer (typically, the exporter) for these costs."

Def.'s Resp. at 35–36 (internal citations omitted). Commerce also points out that Ames itself submitted the surrogate value at issue.

As it did for the labor costs associated with steel pallet production, Commerce again relies on the absence of evidence contrary to its decision to support its determination. Commerce's calculations must be supported by findings and analysis. *See Burlington Truck Lines*, 371 U.S. at 167. Therefore, it is not sufficient for to Commerce rely on its "experience" in determining that certain expenses were included under brokerage and handling, absent any evidence tending to show that this was actually the case. Should Commerce continue to find that the movement expenses at issue here are accounted for under brokerage and handling, it must provide additional information and explanation to support this decision.

CONCLUSION

For the foregoing reasons, the court remands this action to the Department of Commerce for further action in accordance with this opinion.

Remand results are due on August 1, 2005; comments are due on August 31, 2005; and

replies to such comments are due on September 12, 2005.


                                                    /s/ Richard K. Eaton
                                                    Richard K. Eaton

Dated:  May 2, 2005
        New York, New York